5 WS 461
23 SC 493

5 WS 461
30 SC 31

## Mifflin *against* The Commonwealth.

A confederacy to assist a female infant to escape from her father's control, with a view to marry her against his will, is indictable as a conspiracy at the common law.

ERROR to the Quarter Sessions of *Cumberland* county.

Joseph Mifflin, Robert C. Hays and David H. Culbertson, were indicted for having conspired to effect the escape of Jane M. Nevin, an infant, and for having, in pursuance of such conspiracy, actually assisted her to escape in the night, with a view to her marriage with Charles M. Reynolds. A motion in arrest of judgment, on the ground that the matters charged were not indictable, was overruled, and the indictment was removed to this court.

*Biddle* and *Watts*, for the plaintiffs in error, argued that the offence was not indictable; that neither the design of the parties, the object effected, nor the means employed, were criminal; which is essential to constitute crime. They cited 13 *East* 228; *Leach's Crim. Law* 382; *Arch. Crim. Law* 145, 507; 2 *Yeates* 114; 2 *Stra.* 937; 1 *Jour. Jurisp.* 229; 6 *Watts* 519; 2 *Rev. Stat. of New York* 576.

*Graham* and *Alexander*, contra, contended that the offence charged was indictable; and cited 2 *Camp.* 372; 1 *Lev.* 62; 2 *Mass. Rep.* 329; 5 *Har. & Johns.* 317; 2 *Russ. on Crimes* 567; 1 *Salk.* 174; 3 *Chitt. Cr. Law* 1143; 2 *Lord Ray.* 1167; 18 *Eng. Com. Law* 205; 4 *Wend.* 229; 3 *Serg. & Rawle* 224.

The opinion of the Court was delivered by

GIBSON, C. J. — The law of conspiracy is certainly in a very unsettled state. The decisions have gone on no distinctive prin-

v. — 2 o*

[Mifflin v. The Commonwealth.]

ciple; nor are they always consistent. It is settled, however, that there are acts which, though innocent when done by an individual, are criminal when done in concert; but they are not very satisfactorily defined. Mr Russel has attempted to arrange them under particular heads in his Treatise on Crimes, (Vol. 2. p. 553), two of which—confederacies to do a private wrong, and confederacies to do a public mischief—seem to comprise the case under consideration; for nothing can be more grievous to the party, or of worse example to the public, than to steal away a man's daughter from his nurture and admonition. But it is said by Mr East, in his Pleas of the Crown, (Ch. 11, § 9), that however grievous it may be, he has found no instance of an indictment for marrying an infant against the father's consent; and that the cases which contain *dicta* to the contrary do not warrant the assertion to a general extent. As regards the abstract principle, he is undoubtedly correct. *The King* v. *Moor*, (2 *Mod.* 130), where it was said that the taking away of a young maid, which is punishable by the 4 and 5 Phil. and Mary, c. 38, is an offence also at the common law, is contradicted by *The King* v. *Marriot*, (4 *Mod.* 145). But though a clandestine or runaway marriage is not indictable at common law, where it has been procured by the unassisted artifice of the husband, the cases abundantly show it to be otherwise when it has been procured by confederacy. *The King* v. *Twistleton*, (1 *Lev.* 257, S. C. 1 *Sid.* 387), was an information against confederates, who had induced a daughter to elope from her father's house, and marry one of the defendants; and exceptions being taken to the information after conviction, all the Judges agreed that the act was punishable by fine and imprisonment at the common law. *The King and Queen* v. *Thorpe*, (5 *Mod.* 221), was also an information for conspiracy to seduce a son and heir under the age of eighteen, "and carry him out of the custody, counsel and government of his father," with design to marry him to a woman of ill fame; and the court said "It is a misfortune that the marriage is good; it is true, it is lawful to marry, but if it is obtained by unlawful means, it is an offence. The question is, whether a father has not the guardianship of his son and heir till the age of twenty-one, as he had it when there was tenure by knight's service; for the father has an original title vested in him *by nature*, that he might have an action against the lord *quare filium et hæredem suum rapuit.*" Surely he has the same natural title to the guardianship of his infant daughter. These two cases are in point, and uncontradicted.

That the law esteems the stealing of a daughter to be a public mischief, is further shown by *The King* v. *Pigot*, (12 *Mod.* 516), in which the defendant was convicted of a misdemeanor in forcibly attempting to carry away a Mrs Hescot. "Surely," said Lord Holt, "this concerns all the people of England who would dispose of their children well." But other provisions of the law show the

[Mifflin v. The Commonwealth.]

same thing. For the seduction of a daughter, an action lies ostensibly to compensate the loss of her service, but actually to punish her seducer, the pecuniary loss never being taken as the measure of the damages; and the father's admonitory right to concern himself in the affair of his daughter's marriage, is protected by a statute indicative of the public tone, which imposes a penalty on a magistrate or minister for marrying a minor or an apprentice without the parent's or the master's consent. The penalty is indeed given to the party grieved; but evidently to correct the offender rather than to compensate the sufferer. Thus we see how sacred a thing, in the sight of the law, is a father's right to settle his daughter in marriage. And it is a right which is deeply seated, not only in the law of nature, but in the public welfare. The separation of the human race into families is universal; and the care of the offspring for moral culture, as well as preparation for settlement in the world, continues till the expiration of the time assigned by the law as the period of infancy. This natural institution is not only the root of all our virtue and happiness, but the foundation of everything like government, whether patriarchal or political. "The laws of education," says Montesquieu, (Spirit of Laws, Vol. 1, b. 2, ch. 5), "are the first impressions we receive; and as they prepare us for civil life, each particular family ought to be governed pursuant to the plan of the great family which comprehends them all." It would be difficult perhaps to construct a patriarchal government on the model of a federate democracy; but the argument that the moral government of the separate families which compose a nation, is the foundation of its municipal government, is not the less just. It proves, too, that parental authority, which is respected even by savages, is not to be contemned, without introducing disorder into civilized communities; and that the seduction of a daughter from her family allegiance is not a mere civil injury, which does not involve the welfare of society. Yet such is the argument on the part of the defendants, founded, for the most part, on *The King* v. *Turner*, (13 *East* 231), which, to say the least of it, is an odd case. Confederates, armed with clubs to beat down opposition, entered a man's preserve in the night to take and carry away his hares; and Lord ELLENBOROUGH called this "an agreement to go and sport on another's ground;" in other words, "to commit a civil trespass!" It would be a curious thing to know what he would have called an agreement to steal a man's pigs, or to rob his henroost. In its mildest aspect, the entry into the preserve with bludgeons was a riot, which, it appears by a note in the second volume of Mr Chitty's Criminal Law, page 506, may be a subject of conspiracy.

But whatever may be said of *The King* v. *Turner*, there are certainly other cases of the same stamp. In *Rex* v. *Pywell*, (1 *Stark. Rep.* 402), a confederacy to cheat in the sale of a horse, was held

to be innocent; and in *The State* v. *Dickey*, (4 *Halstead* 293), it was held that a civil injury, which is not indictable when committed by an individual, does not contract the quality of guilt by being the act of a confederacy. But the contrary was held in *The State* v. *Buchanan*, (5 *Har.* & *J.* 317), and in *The King* v. *Stratton*, (1 *Camp.* 549), a confederacy to deprive the secretary of a trading company of his office, was held not to be indictable only because the company was illegal. These discrepancies show the want of a test for doubtful cases; but there are cases of such transcendental wrong and outrage, as leave no doubt of their character; and a confederacy to steal a daughter is not the least of them. It is a denial or contempt of the father's right to counsel and advise; and it is only less atrocious than the conspiracy in *The King* v. *Grey*, (3 *St. Tr.* 519), and that in *The King* v. *Delaval*, (3 *Burr.* 1437), to ruin a virgin by enticing her to desert her father's protection, and live in a state of concubinage. A marriage at twelve, which is valid for the sake of the issue, would be scarce less brutal or offensive to the feelings of the family; and why, but to protect the feelings of relatives, was a combination to take up dead bodies, for scientific purposes, which is not essentially immoral, held to be indictable in *Rex* v. *Lynn?* (2 *T. R.* 733). But if it would be indictable to procure the elopement of a girl who had just attained the age of consent, at what other age within the period of infancy would such an act be innocent; and how would the law discriminate? It is true that Mr Justice BULLER was of opinion, in *Rex* v. *Fowler*, (2 *East's P. C. ch.* 11, § 11), that as the act of marriage is lawful in itself, a combination to procure it can become criminal only by the use of undue means; but the parties, in that case, were *sui juris*, and he left the question, what is undue means, an open one. If the subject of the present indictment is no more than a private wrong, it must pass entirely without rebuke; for it would be easier to find a precedent for a criminal corrective of it, than a civil one. But even a private injury, such as hissing an actor, or impoverishing a man, becomes a public wrong when done in concert; and this was certainly so.

Even had the precedents not reached the case before us, there would be no reason why the law of conspiracy should stop short of it now, considering the smallness of the point from which it started, and the degree of its subsequent expansion. In Lord COKE's day it was limited to " a consultation and agreement between two or more, to appeal or indict a person falsely and maliciously ;" 3 *Inst.* 143 ; since when, it has spread itself over the whole surface of mischievous combination. I am not one of those who fear that the catalogue of crimes will be unduly enlarged by its progress, seeing, as I do, that it is never invoked except as a corrective of disorder which would else be without one, and as a curb to the immoderate power to do mischief which is gained by a combination of the means. It is true, that there is no recent

[Mifflin v. The Commonwealth.]

precedent of an indictment like the present; but had not the 3 H. 7, c. 2, and the 39 Eliz. c. 9, provided a more energetic remedy for the offence, common law precedents of indictments for it would have abounded. But were we without even the semblance of a precedent, we could not hesitate to pronounce the act of which the defendants have been convicted, a common law offence.

Judgment affirmed.