# The Morris Run Coal Company *versus* The Barclay Coal Company.

| 68 | 173 |
| 159 | 431 |
| 161 | 482 |

| 68 | 173 |
| 23 SC | 494 |

| 68 | 173 |
| 22 SC | 390 |

| 68 | 173 |
| c210 | 299 |

1. Five coal corporations of Pennsylvania entered into an agreement in New York to divide two coal regions of which they had the control; to appoint a committee to take charge of their interests, which was to decide all questions and appoint a general agent at Watkins, New York; the coal mined to be delivered through him, each corporation to deliver its proportion at its own cost in the different markets at such time and to such persons as the committee might direct; the committee to adjust the prices, rates of freight, &c., enter into agreements with anthracite companies ; the five companies might sell their coal themselves only to the extent of their proportion and at prices adjusted by the committee; the agent to suspend shipments by either beyond their proportion ; frequent detailed reports to be made by companies, and settlements monthly by the committee, prices to be averaged and payments made to those in arrear by those in excess, neither to sell coal otherwise than as agreed upon, and the regulations of the committee to be carried out faithfully. A statute of New York makes it a misdemeanor for " persons to conspire to commit any act injurious to trade or commerce." *Held,* that their agreement was in contravention of the statute and also against public policy and therefore illegal and void.

2. A restraint upon a trade or employment which is general is void.

3. A restraint upon trade to be valid must be partial, the consideration adequate and not colorable and the restriction reasonable.

4. A good test is whether the restraint is such as only to afford a fair protection to the party in whose favor it is, and not so large as to interfere with the interests of the public.

5. Whatever is injurious to the public interest is void on the ground of public policy.

6. The presumption is that restraints on trade are illegal, unless made upon adequate consideration and on circumstances both reasonable and useful.

7. The public interest is superior to private, and all restraints on trade are injurious to the public in some degree.

[Morris Run Coal Co. *v.* Barclay Coal Co.]

8. The general rule is that all restraints on trade, if nothing more appear, are bad.

9. The combination under the agreement in this case was more than a contract, it was an offence.

10. A combination is criminal when the act to be done necessarily tends to prejudice the public or oppress individuals by unjustly subjecting them to the power of the confederates.

11. In such unlawful combinations the gist of the offence is the conspiracy.

12. If the motives of the confederates be to oppress, the means they use unlawful or the consequences to others injurious, it is a conspiracy.

13. "*A corner*," whether to affect the price of articles of commerce or the price of vendible stocks, by confederation to raise or depress the price and operate on the markets, is a conspiracy.

14. Every association to raise or depress the price of labor beyond what it would bring if left without aid or stimulus, is criminal.

15. To fix a standard of prices among men of the same employment is not in itself criminal, but may become so if coercion, restraint, penalties or force of arms be resorted to.

16. If the means be unlawful the combination is indictable.

17. A draft drawn by the general agent of the corporations in this case to equalize prices in favor of one of the corporations on another of them and accepted, could not be recovered against the latter.

18. Such transaction was not an independent cause of action.

19. A note, &c., if but an instrument to execute an illegal contract, is tainted by the illegality and cannot be recovered.

20. Swan *v.* Scott, 11 S. & R. 164, Lestapies *v.* Ingram, 5 Barr 71, Keeler *v.* Taylor, 3 P. F. Smith 468, recognised and approved.

March 14th and 15th 1871. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Bradford county:* No. 282, to January Term 1871.

This was an action of debt commenced May 31st 1869, by The Morris Run Coal Company against The Barclay Coal Company, on an accepted draft on the defendants in favor of the plaintiffs for $2466.99.

The case was referred to the Hon. William Elwell, as referee under the Act of April 6th 1869, Pamph. L. 275, and its supplement of January 20th 1870, Pamph. L. 85, Purd. 1592.

The facts of the case and the principles of law raised will be found in the following statement from the referee's report:—

" *Conclusions of fact.*—Both the plaintiff and defendant are corporations, chartered under the laws of the Commonwealth of Pennsylvania before the 15th February 1866, and have still existence under the authority conferred by their respective acts of incorporation.

" On the 2th October 1866, a draft was drawn upon the Barclay Coal Company, the defendant, in favor of the Morris Run Coal Company, the plaintiff, as follows:—

" $2466.99 Watkins, N. Y., October 9th 1866.

Pay to the order of Morris Run Coal Co., Two thousand four hundred and sixty-six 99-100 dollars, in current rate of exchange

[Morris Run Coal Co. *v.* Barclay Coal Co.]

on New York, value received, and charge the same to account of equalization contract.

To J. M. WARD,　　　(Signed)　　GEO. J. MAGEE,
　Supt. Barclay Coal Co.　　　　　Genl. Sales Agent.

Which draft was accepted by J. M. Ward, who was at the time general superintendent and agent of the defendant, in these words, endorsed thereon:—

"Accepted, payable six months from date at the Banking House of B. S. Russel & Co., Towanda, Pa.
　　　　　　　(Signed)　　　J. M. WARD,
　　　　　　　　　　　　Supt. Barclay Coal Co.'

"This draft was accepted at Towanda, Pa. It was presented at maturity at the banking-house of B. S. Russel & Co., in Towanda, and payment was refused. At that time the current rate of exchange on New York was one-fourth of one per cent.

"The plaintiff having on the hearing of this case before the referee established the foregoing facts rested its case. * * *.

"Thereupon evidence was given which established the following, which I find to be the facts of the case, to wit:—

"On the 15th February 1866, the several coal companies mentioned in the contract below, were bodies corporate, chartered under the laws of this Commonwealth, engaged in the mining and shipping of bituminous coal from the coal-fields of Bradford and Tioga counties, known and designated in said contract as the Blossburg and Barclay coal regions, in this state. The sales made under the agreement were almost exclusively in the state of New York.

"The contract was entered into the 15th day of February, A. D. 1866, between The Fall Brook Coal Company, party of the first part, the Morris Run Coal Company, party of the second part, of the Blossburg Coal region, the Barclay Coal Company, party of the third part, the Fall Creek Bituminous Coal Company, party of the fourth part, and the Towanda Coal Company, party of the fifth part, of the Barclay Coal region, as follows, to wit:

"The said coal companies do severally agree with each other that the market for bituminous coal from the Blossburg and from the Barclay regions (except as hereinafter mentioned), shall be divided between the two coal regions, so that the Blossburg region shall have the right and privilege of supplying, by the said two companies above mentioned, 70 per cent. of the whole quantity of coal sent to market, and the Barclay region 30 per cent.; and that the shares of each region shall be subdivided between the coal companies of each region as they may agree among themselves." * * *

Then follows the proportion in which the division shall be made between the respective companies.

[Morris Run Coal Co. *v.* Barclay Coal Co.]

" It is understood that all coal mined and sold by the Morris Run Coal Company to the Salt Company of Onondaga, under their lease of the said Salt Company mines, and used for the manufacture of salt on the Onondaga Salt Reservation, shall not be counted as a part of said Morris Run Coal Company's portion of the market, and said coal shall not be considered as included in this agreement in any way whatever, but the same is expressly excepted herefrom.

" It is understood that this agreement shall take effect on the opening of the Erie Canal next spring, and continue for one year, and shall embrace all the coal which the respective parties shall have afloat on boats, or on hand at Watkins, Coal Point, or any place in the state of New York, or which they during its operation shall cause to be transported north of the Pennsylvania state line; excepting therefrom salt coal, as herein stated, and coal used by the respective parties in their own transportation.

" The business contemplated by this agreement shall be under the control of an executive committee of three persons, one to be appointed by the party of the first part, one by the party of the second part, and one by the parties of the third, fourth and fifth parts, jointly, and until otherwise ordered by the parties respectively, the members of the committee shall consist of, &c. * * *

. " In the decision by the said committee of all questions of general interest of the parties hereto, the members of the committee from the Blossburg region shall have two votes, and the member from the Barclay region one vote; but in the decision of questions of adverse interests between the two coal regions, the member of the committee from the Barclay region shall have equal power with the Blossburg members;" with provision for an umpire in case of a tie vote.

* * * " The committee shall appoint a general sales agent, and such other agents and assistants," &c., to * * * " be paid by the several parties hereto in proportion to the respective portion of the market supplied by them.

" George J. Magee shall be the general sales agent for the time being and until otherwise ordered by the committee, and the office of said general sales agent shall be at Watkins."

" In order more fully to define the respective rights of the parties hereto, the following further provisions are agreed upon, to wit : * * *

3. " Each party shall at its own cost and expense deliver its proportion of the different kinds of coal in the different markets, at such times and to such parties as the committee shall from time to time through the general sales agent or otherwise direct.

4. " Inasmuch as it may not be practicable for each party to deliver in each of the markets precisely their proportion of coal,

[Morris Run Coal Co. v. Barclay Coal Co.]

it is agreed that a general average of the sales of all the parties shall be made and the same shall be adjusted monthly so that each party will receive the same average price per ton for their coal at a common point.

"5. Watkins, including Coal Point, is agreed upon as the common point of average.

"6. The average price received for coal will be arrived at in the following manner, to wit, &c. * * *

"7. The committee will from time to time adjust the prices of coal for the different markets, and the conditions of the sale thereof.

"8. The committee will from time to time adjust and fix the rates of freight from Watkins, and such matters as pertain thereto. * * *

"10. The committee are authorized to enter into such an agreement with the anthracite coal companies in regard to the sale of coal as they shall deem best for the interest of the parties hereto.

"11. Under the control and direction of the committee each of the parties hereto may act as agents in the sale of coal, but only to the extent of their proportion, and only at the prices adjusted by the committee; and the collections for the same shall be at the risk of the party making the sale and furnishing the coal, and only in case all the rules and regulations of the committee are carried out. But all losses on sales made by the general sales agent, or by order of the committee, shall be borne by all the parties hereto *pro ratâ* in proportion to the quantity of coal furnished by each company.

"It being understood and agreed by said parties that all sales, shipments and deliveries by or for either or any of said parties, except as herein specifically excluded from the terms of this agreement, shall as between these parties and for the purposes of this agreement be deemed to be made by said committee through such general sales agent in the name and for the account of the party furnishing the coal, and that each of said parties shall, unless said committee shall otherwise direct or provide, refer and send at once all orders or propositions received by them respectively, relating to the sale of coal, to said general sales agent prior to any action by themselves thereon, and said general sales agent shall advise said parties from time to time of the whole amount of coal shipped by all the parties, and shall direct a suspension of shipments or deliveries by either party making such sales or deliveries beyond its proportion, and thereupon such party shall suspend shipments until the executive committee shall direct their resumption.

"12. It is understood and agreed between the parties hereto that this agreement shall not be taken, held or construed to constitute a partnership between said parties, or so as to make any
18 P. F. Smith—12

[Morris Run Coal Co. *v.* Barclay Coal Co.]

one of the parties hereto responsible for the default or failure of any other party, and in all sales of coal made by said general sales agent or otherwise, in pursuance of this agreement, the bills shall be made out in the name of the party furnishing the coal, and all contracts which may be made for the sale and delivery of coal shall be in the name of the party who is to furnish the coal to fill the contract, so that no other party shall be in anywise responsible for the fulfilment of the same.

"13. It shall be the duty of each party to furnish to the general sales agent detailed reports ending on the 10th, 20th and last day of each month, and at such other times and for such periods as he shall direct, of all coal of each kind shipped and sold, or agreed to be shipped and sold by them, &c.; * * and such other detail as may be required by the committee or general sales agent, &c.

"14. On or before the 10th of each month the general sales agent shall furnish to each member of said committee a statement showing the whole quantity sold and shipped during the preceding month, &c. * * *

"15. The said committee shall meet monthly to receive the statements of the general sales agent and settle the accounts of the preceding month, it being understood and agreed that as far as possible all matters and things between the parties hereto under this agreement shall be settled monthly, all which settlements shall be predicated of the principle that each party is entitled to the average price per ton that each kind of coal was sold for at each place of sale during the preceding month, subject to the payment of the expenses aforesaid, and thereupon the proper payments between the parties shall be made—that is to say, the parties having received more than the average price for each or either kind of coal shall pay to the parties having received less than such average so as to produce that result.

"16. Each party shall furnish its appropriate proportion of the several kinds of coal; * * * and failures to comply with this provision shall be adjusted equitably between the parties by the executive committee. * * *

"18. Any of the parties desiring to do so, may have their sales collected by the general sales agent.

"19. The two regions, Blossburg and Barclay, may each have one party in Buffalo and one in Oswego, to purchase and sell their coals in those markets, to be selected by the members of the committee from each region respectively.

"20. Each party hereto agrees that they will not cause or permit any coal to be shipped or sold otherwise than as the same has been herein agreed upon, and that all rules and regulations of said executive committee in relation to the business provided for in this agreement shall be truly and faithfully carried out."

[Morris Run Coal Co. *v.* Barclay Coal Co.]

" This contract was signed by the parties as it purports to have been at Elmira in the state of New York, on the day of its date.

" The Barclay and Blossburg coal-mines are the only mines furnishing the kind of coal mined and shipped by these companies, except the Cumberland coal, which latter in order to reach the same markets north would have to be shipped by tide-water. There was some of the same kind of coal mined in McKean and Elk counties in this state, but in quantities so small as that it was not considered by these companies as coming in competition with them. The coal of the Blossburg and Barclay regions is adapted to mechanical purposes and for generating steam. Wherever sold it comes in competition with anthracite coal, and also with the Cumberland coal sent by tide-water to Troy, New York, to which point both kinds of bituminous coal are shipped.

" During the season of 1866 these companies made sales of coal at Oswego and Buffalo to parties who shipped to Chicago, Milwaukie and other western cities. It then came in competition to some extent with the Pittsburg coal. The latter is used for making gas, but the coal of these companies cannot be used for that purpose.

" Under the provisions of the contract the executive committee therein provided for and representing the several companies met monthly and fixed the prices of coal. They did not make adjustments and equalization every month, but let it run sometimes two and sometimes three months between adjustments. When they did make adjustments the business of each month was separately calculated, and the result put down upon a book which was kept by them as a record of their proceedings. * * *

" The equalization of the accounts as aforesaid for the months of August and September 1866, as shown on page 21 of said book, exhibits the following summary :—

|  |  | Cr. |
|---|---|---|
| " Fall Brook Coal Company, | | $365 54 |
| Morris Run Coal Company, | | 12,829 79 |
|  | Dr. |  |
| Barclay Coal Company, | $2,832 53 | |
| Fall Creek Coal Company, | 1,150 89 | |
| Towanda Coal Company, | 9,216 11 | |
|  | $13,199 53 | $13,195 33 |
| Difference, | 4 20 | |

" On the 9th of October 1866, the executive committee met at Towanda and made the adjustment and equalization for the months of August and September as above stated, which was satisfactory to all parties. They directed the general sales agent to make drafts on parties having received more than the average price for their coal, in favor of parties that have received less than the average price. * * *

[Morris Run Coal Co. *v.* Barclay Coal Co.]

" The draft in suit was drawn for the balance found against the Barclay Coal Company $2832.53, less the $365.54 due the Fall Brook Company, for which last sum a draft was probably drawn, so that under the adjustment there remained due from the Barclay Coal Company the sum of $2466.99, for which the draft was drawn. * * *

" The bulk of shipments made by the Barclay Coal Company was made before the settlement of October 1866. For the subsequent shipments a computation was made on the 20th January 1867, and there was found due under the contract to the Barclay Coal Co. on the business subsequent to that adjusted in October the sum of $49.26, for which a draft was drawn in its favor on the Towanda Coal Company which it still holds, not having presented it.

" The tonnage of the Barclay Company for the ten months that the contract was in force, was its full proportion under the contract and 528 tons over.

" There was no disagreement between the parties as to correctness of the calculations which produced the results as to amounts in the summaries before stated ; but after the acceptance of the draft in suit the Barclay Company insisted that the business of the whole year should be brought into a mass instead of adjusting it month by month separately.

" The statutes of New York were produced before the referee by the counsel for the defendant, by which it appears that ' If two or more persons shall conspire 1, " To commit any offence —or 2, To commit any act injurious to the public health, to public morals, or to trade or commerce"—they shall be deemed guilty of a misdemeanor.'

" It also appeared that the location of the general sales agent was to be at Watkins, in the state of New York, the point of average was in that state, and the business of the companies in making sales was more extensive in that state than elsewhere.

" On the hearing there was no dispute in regard to the facts." * * *

" The plaintiff's points were :—

" 1. That the agreement dated 15th February 1866, is founded upon sufficient consideration to make it binding upon the parties thereto.

" 2. That said contract is not contrary to public policy at common law, nor void under the statute.

" 3. That if said contract was void, yet the acceptance of the draft in question, by the defendant in the state of Pennsylvania, created a new and valid contract, founded upon a sufficient consideration to enable the plaintiff to recover.

" The defendant's points were :—

" 1. That the agreement, dated February 15th 1866, and the

[Morris Run Coal Co. v. Barclay Coal Co.]

rights of the parties under said contract, are to be determined and decided by the laws of the state of New York, and under the laws of said state the said contract is null and void.

" 2. That the draft in suit is without legal consideration, and that the plaintiff cannot recover thereon.

" *Conclusions of law :—*

" 1. The contract of 15th February 1866, having been entered into in the state of New York, where it was to be mainly executed, was void by the statute of that state, which makes it a misdemeanor for two or more persons to conspire to commit any act injurious to trade or commerce.

" 2. It was void by the common law as against public policy.

" 3. It was not so far executed as to prevent the defendant from setting up between the parties to the transaction the illegality of the consideration of the draft in question.

" 4. And, therefore, under all the evidence in the cause, the defendant is entitled to judgment." * * *

The plaintiffs took out a writ of error, and assigned for error,—

1, 3. Refusing to affirm the plaintiffs' points.

4. His four conclusions of law.

*U. Mercur* (with whom was *E. Overton, Jr.*), for plaintiffs in error.—The agreement was but for a year, and to operate in but a limited portion of the state of New York ; it was not a general restraint of trade, and therefore was good : Chitty on Contracts 591, 597, 599. The restraint is valid, unless plainly beyond what the party's interests require : Wickens *v.* Evans, 3 Y. & J. 318.

The action is on the draft, and the contract was not needed to establish it : Swan *v.* Scott, 11 S. & R. 164 ; Thomas *v.* Brady, 10 Barr 164 ; Scott *v.* Duffy, 2 Harris 20. The contract was executed : Lestapies *v.* Ingram, 5 Barr 71 ; Fox *v.* Cash, 1 Jones 207. The defendants' acceptance was on a new consideration : Tabor *v.* Armstrong, 4 W. C. C. R. 299.

*J. De Witt*, for defendant in error.

The opinion of the court was delivered, May 8th 1871, by

AGNEW, J.—This was an action on a bill drawn upon one party in favor of another party to a contract between five coal companies, for a sum found due in the equalization of prices under the contract. It raises a question of great importance to the citizens of this state and the state of New York, where the contract was made, and was in part to be executed, to wit : whether the contract was illegal, as being contrary to the statute of New York, or at common law, or against public policy. The instrument bears date the 15th day of February 1866. The parties are five

[Morris Run Coal Co. *v.* Barclay Coal Co.]

coal companies, incorporated under the laws of Pennsylvania, to wit: The Fall Brook Coal Company and Morris Run Coal Company, of the Blossburg coal region; and the Barclay Coal Company, Fall Creek Bituminous Coal Company, and Towanda Coal Company, of the Barclay coal region. By the agreement the market for the bituminous coal from these two regions is divided among these parties in certain proportions. A committee of three is appointed to take charge and control of the business of all these companies, to decide all questions by a certain vote, and to appoint a general sales agent to be stationed at Watkins, New York. Provision is made for the mining and delivery of coal, their kinds, and for its sale through the agent, subject, however, to this important restriction, that each party shall, at its own costs and expense, deliver its *proportion* of the different kinds of coal in the different markets *at such times and to such parties as the committee shall from time to time direct.* The committee is' authorized to adjust *the prices of coal in the different markets* and the rates of freight, and also to enter into such an agreement with the anthracite coal companies as will promote the interest of these parties. Then comes an important provision that the companies may sell their coal themselves, but only to *the extent of their proportion,* and only *at the prices adjusted by the committee.* It is also provided that the general sales agent shall direct a suspension of shipment or deliveries of coal by any party making sales or deliveries *beyond its proportion,* and thereupon such party *shall suspend shipments* until the committee shall direct a resumption. Detailed reports of the business are to be made by the companies to the general sales agent at fixed and short intervals, and settlements are to be made by the committee monthly, prices averaged, and payments made by the companies in excess to those in arrear; and finally, each party binds itself *not to cause or permit any coal to be shipped or sold otherwise than as the same has been agreed upon, and that all rules and regulations by the executive committee in relation to the business shall be faithfully carried out.*

In regard to the relation these companies hold to the public, the field of their mining operations, the markets they supply, the extent of their coal-fields, and the general supply of coal, the distinguished referee, Judge Elwell, finds as follows: "The Barclay and Blossburg coal-mines are the only coal-mines furnishing the kind of coal mined and shipped by these companies, except the Cumberland coal, which latter, in order to reach the same markets, north, would have to be shipped by tidewater. There was some of the same kind of coal mined in McKean and Elk counties, in this state, but in quantities so small as that it was not considered by these companies as coming into competition with them. The coal of the Blossburg and Barclay regions is adapted

to mechanical purposes and for generating steam. Wherever sold it comes into competition with anthracite coal, and also with the Cumberland coal sent by tidewater to Troy, New York, to which point both kinds of bituminous coal are shipped."

During the season of 1866 these companies made sales of coal at Oswego and Buffalo to parties who shipped to Chicago, Milwaukie and other western cities. It there came into competition to some extent with Pittsburg coal. The latter is used for making gas, but the coal of these companies cannot be used for that purpose.

The referee found that the statute of New York is, "if two or more persons shall conspire," first, "to commit any offence;" second, "to commit any act injurious to the public health, to public morals, or to trade or commerce, they shall be deemed guilty of a misdemeanor."

The referee found, as his conclusion upon the whole case, that the contract was void by the statute, and void at common law, as against public policy. The restraint of the contract upon trade and its injury to the public is thus clearly set forth by the referee: "These corporations (he says) represented almost the entire body of bituminous coal in the northern part of the state. By combination between themselves they had the power to control the entire market in that district. And they did control it by a contract not to ship and sell coal otherwise than as therein provided. And in order to destroy competition they provided for an arrangement with dealers and shippers of anthracite coal. They were thereby prohibited from selling under prices to be fixed by a committee representing each company. And they were obliged to suspend shipments upon notice from an agent that their allotted share of the market had been forwarded or sold. Instead of regulating the business by the natural laws of trade, to wit, those of demand and supply, these companies entered into a league, by which they could limit the supply below the demand in order to enhance the price. Or if the supply was greater than the demand, they could nevertheless compel the payment of the price arbitrarily fixed by the joint committee. The restraint on the trade in bituminous coal was by this contract as wide and extensive as the market for the article. It already embraced the state of New York, and was intended and no doubt did affect the market in the Western States. It is expressly stipulated that the parties to this contract shall not be considered as partners. The agreement was not entered into for the purpose of aggregating the capital of the several companies, nor for greater facilities for the transaction of their business, nor for the protection of themselves by a reasonable restraint, as to a limited time and space, upon others who might interfere with their business."

The plaintiff in error's reply to this vigorous statement of the

[Morris Run Coal Co. *v.* Barclay Coal Co.]

purpose of the contract and its effect upon the public interest, alleges that its true object was to lessen expenses, to advance the quality of the coal, and to deliver it in the markets it was to supply, in the best order, to the consumer. This is denied by the defendants; but it seems to us it is immaterial whether these positions are sustained or not. Admitting their correctness, it does not follow that these advantages redeem the contract from the obnoxious effects so strikingly presented by the referee. The important fact is that these companies control this immense coalfield; that it is the great source of supply of *bituminous* coal to the state of New York and large territories westward; that by this contract they control the price of coal in this extensive market, and make it bring sums it would not command if left to the natural laws of trade; that it concerns an article of prime necessity for many uses; that its operation is general in this large region, and affects all who use coal as a fuel; and this is accomplished by a combination of all the companies engaged in this branch of business in the large region where they operate. The combination is wide in scope, general in its influence, and injurious in effects. These being its features, the contract is against public policy, illegal, and therefore void.

The illegality of contracts affecting public trade appears in the books under many forms. The most frequent is that of contracts between individuals to restrain one of them from performing a business or employment. The subject was elaborately discussed in the leading case of Mitchell *v.* Reynolds, 1 Peere Williams 181, to be found also in 1 Smith's Lead. Cases 172. The distinction is there taken which now marks the current of judicial decision everywhere; that a restraint upon a trade or employment which is general, is void, being contrary to public interest, really beneficial to neither party, and oppressive at least to one. " General restraints (says Parker, J.) are all void, whether by bond, covenant or promise, with or without consideration, and whether it be of the party's own trade or not;" citing Croke Jam. 596; 2 Buls. 136; Allen 67. To obtain, he says, the sole exercise of any known trade throughout England, is a complete monopoly, and against the policy of the law. A reason given is " the great abuses these voluntary restraints are liable to, as, for instance, from corporations, who were perpetually laboring for exclusive advantages in trade, and to reduce it into as few hands as possible." In reference to a contract not to trade in any part of England, it is said, there is something more than a presumption against it, because it never can be useful to any man to restrain another from trading in all places, though it may be to restrain him from trading in some, unless he intends a monopoly, which is a crime. These principles have been sustained in many cases which need not be cited, as most of them will be found in Mr. Smith's note to the

leading case. The result of those in which particular restraints upon trade have been held to be valid between individuals is, that the restraint must be partial only, the consideration adequate and not colorable, and the restriction reasonable. Upon the last requisite, Tindal, C. J., remarks in Horner *v.* Graves, 7 Bing. 743:— "We do not see how a better test can be applied to the question whether reasonable or not than by considering whether the restraint is such only as to afford a fair protection as to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatsoever restraint is larger than the necessary protection of the party can be of no benefit to either; it can only be oppressive, and if oppressive, it is in the eye of the law unreasonable. What is injurious to the public interest is void on the ground of public policy."

Many cases have been decided as to what is a reasonable restriction and what is not, and is therefore void, but two only may be referred to as illustrations. In Mallan *v.* May, 11 M. & W. 653, a covenant not to practise as a dentist in London, or in any of the places in England or Scotland, where the plaintiff might have been practising before the expiration of the term of service with them was held to be reasonable as to the limit of London, but unreasonable and void as to the remainder of the restriction. So in Green *v.* Price, 13 M. & W. 695, a covenant not to follow the perfumery business in the cities of London and Westminster, or within the distance of 600 miles therefrom, was good as to the cities and void as to the limit of 600 miles. See also Pierce *v.* Fuller, 8 Mass. 223, and Chappel *v.* Brockway, 21 Wend. 158. An important principle stated in these cases is that as to contracts for a limited restraint the courts start with a presumption that they are illegal unless shown to have been made upon adequate consideration, and upon circumstances both reasonable and useful. This presumption is a necessary consequence of the general principle, that the public interest is superior to private, and that all restraints on trade are injurious to the public in some degree. The general rule (said Woodward, C. J.) is that all restraints of trade, if nothing more appear, are bad: Keeler *v.* Taylor, 3 P. F. Smith 468. That case may be instanced as a strong illustration of the rule as to what is not a reasonable restriction; and the principles I have been stating are recognised in the opinion. Keeler agreed to instruct Taylor in the art of making platform scales, and to employ him in that business at $1.75 per day. Taylor engaged to pay Keeler or his legal representatives $50 for each and every scale he should thereafter make for any other person than Keeler, or which should be made by imparting his information to others. This was held to be an unreasonable restriction upon Taylor's labor, and therefore void, as in restraint of trade. Testing the present contracts by these principles, the

[Morris Run Coal Co. *v.* Barclay Coal Co.]

restrictions laid upon the production and price of coal cannot be sanctioned as reasonable, in view of their intimate relation to the public interests.    The field of operation is too wide and the influence too general.

The effects produced on the public interests lead to the consideration of another feature of great weight in determining the illegality of the contract, to wit: the combination resorted to by these five companies.    Singly each might have suspended deliveries and sales of coal to suit its own interests, and might have raised the price, even though this might have been detrimental to the public interest.    There is a certain freedom which must be allowed to every one in the management of his own affairs.    When competition is left free, individual error or folly will generally find a correction in the conduct of others.    But here is a combination of all the companies operating in the Blossburg and Barclay mining regions, and controlling their entire productions. They have combined together to govern the supply and the price of coal in all the markets from the Hudson to the Mississippi rivers, and from Pennsylvania to the lakes.    This combination has a power in its confederated form which no individual action can confer.    The public interest must succumb to it, for it has left no competition free to correct its baleful influence.    When the supply of coal is suspended, the demand for it becomes importunate, and prices must rise.    Or if the supply goes forward, the price fixed by the confederates must accompany it.    The domestic hearth, the furnaces of the iron master, and the fires of the manufacturer, all feel the restraint, while many dependent hands are paralyzed, and hungry mouths are stinted.    The influence of a lack of supply or a rise in the price of an article of such prime necessity, cannot be measured.    It permeates the entire mass of community, and leaves few of its members untouched by its withering blight.    Such a combination is more than a contract, it is an offence.    "I take it," said Gibson, J., "a combination is criminal whenever the act to be done has a necessary tendency to prejudice the public or to oppress individuals, by unjustly subjecting them to the power of the confederates, and giving effect to the purpose of the latter, whether of extortion or of mischief:" Commonwealth *v.* Carlisle, Brightly's Rep. 40.    In all such combinations where the purpose is injurious or unlawful, the gist of the offence is the conspiracy.    Men can often do by the combination of many, what severally no one could accomplish, and even what when done by one would be innocent.    It was held, in The Commonwealth *v.* Eberle, 3 S. & R. 9, that it was an indictable conspiracy for a portion of a German Lutheran congregation to combine and agree together to prevent another portion of the congregation, by force of arms, from using the English language in the worship of God among the congregation.    So a confederacy to assist a female

infant to escape from her father's control with a view to marry her against his will, is indictable as a conspiracy at common law, while it would have been no criminal offence if one alone had induced her to elope with and marry him: Mifflin v. Commonwealth, 5 W. & S. 461.   One man or many may hiss an actor; but if they conspire to do it they may be punished: per Gibson, C. J., Hood v. Palm, 8 Barr 238; 2 Russel on Crimes 556.   And an action for a conspiracy to defame will be supported though the words be not actionable, if spoken by one:   Hood v. Palm, *supra*.   "Defamation by the outcry of numbers," says Gibson, C. J., " is as resistless as defamation by the written act of an individual."   And says Coulter, J., " The concentrated energy of several combined wills, operating simultaneously and by concert upon one individual, is dangerous even to the cautious and circumspect, but when brought to bear upon the unwary and unsuspecting, it is fatal:"   Twitchell v. Commonwealth, 9 Barr 211. There is a potency in numbers when combined, which the law cannot overlook, where injury is the consequence.   If the conspiracy be to commit a crime or an unlawful act, it is easy to determine its indictable character.   It is more difficult when the act to be done or purpose to be accomplished is innocent in itself.   Then the offence takes its hue from the motives, the means or the consequences.   If the motives of the confederates be to oppress, the means they use unlawful, or the consequences to others injurious, their confederation will become a conspiracy.   Instances are given in The Commonwealth v. Carlisle, Bright. R. 40.   Among those mentioned as criminal is a combination of employers to depress the wages of journeymen below what they would be, if there were no resort to artificial means; and a combination of the bakers of a town to hold up the article of bread, and by means of the scarcity thus produced to extort an exorbitant price for it.   The latter instance is precisely parallel with the present case.   It is the effect of the act upon the public which gives that case and this its evil aspect as the result of confederation; for any baker might choose to hold up his own bread, or coal operator his coal, rather than to sell at ruling prices; but when he destroys competition by a combination with others, the public can buy of no one.

In Rex v. De Berenquetal, 3 M. & S. 67, it was held to be a conspiracy to combine to raise the public funds on a particular day by false rumors.   The purpose itself, said Lord Ellenborough, is mischievous—it strikes at the price of a valuable commodity in the market, and if it gives a fictitious price by means of false rumors, it is a fraud levelled against the public, for it is against all such as may possibly have anything to do with the funds on that particular day.   Every " corner," in the language of the day, whether it be to affect the price of articles of commerce, such as breadstuffs, or the price of vendible stocks, when accom-

plished by confederation to raise or depress the price and operate on the markets, is a conspiracy. The ruin often spread abroad by these heartless conspiracies is .indescribable, frequently filling the land with starvation, poverty and woe.. Every association is criminal whose object is to raise or depress the price of labor beyond what it would bring if it were left without artificial aid or stimulus: Rex *v.* Byerdike, 1 M. & S. 179. In the case of such associations the illegality consists most frequently in the means employed to carry out the object. To fix a standard of prices among men in the same employment, as a fee bill, is not in itself criminal, but may become so when the parties resort to coercion, restraint or penalties upon the employed or employers, or what is worse, to force of arms. If the means be unlawful the combination is indictable: Commonwealth *v.* Hunt, 4 Metc. 111. A conspiracy of journeymen of any trade or handicraft to raise the wages by entering into combination to coerce journeymen and master workmen employed in the same branch of industry to conform to rules adopted by such combination for the purpose of regulating the price of labor, and carrying such rules into effect by overt acts, is indictable as a misdemeanor: 3 Whart. C. L., citing The People *v.* Fishbee, 14 Wend. 9. Without multiplying examples, these are sufficient to illustrate the true aspect of the case before us, and to show that a combination such as these companies entered into to control the supply and price of the Blossburg and Barclay regions is illegal, and the contract therefore void.

A second question is, whether the bill drawn in this case by the general sales agent on the Barclay Coal Company in favor of the Morris Coal Company to equalize prices upon a settlement under the contract, is such an independent cause of action as will support the suit. When a bill, note or bond is but an instrument to execute an illegal contract, it is tainted by the illegality and cannot be recovered. The illegal consideration enters directly into the instrument, and is followed up because the law will not permit itself to be violated by mere indirection. This is the principle mentioned in the cases of Stears *v.* Lashley, 6 Term Rep. 61 ; Swan *v.* Scott, 11 S. & R. 164 ; Stanton *v.* Allen, 5 Denio 434 ; Fisher *v.* Bridges, 3 E. & B. 642 ; Lestapies *v.* Ingraham, 5 Barr 82. In the last case, Gibson, C. J., says: "The solemnity of the security would not preclude an inquiry into the consideration of it had it been illegal ;" and in Swan *v.* Scott, Duncan, J., said of a bond, the consideration of which grew out of an illegal transaction, "there the illegal consideration is the sole basis of the bond, and there can be no recovery." In the present case the bill itself refers directly to the equalization account, and was given in immediate execution of the contract. This being the case, it is distinguishable from Fackney *v.* Reynous, 4 Burrows 2065 ;

[Morris Run Coal Co. v. Barclay Coal Co.]

Petrie v. Hannay, 3 Term R. 418; Warner v. Russell, 1 Bos. & Pul. 295; Lestapies v. Ingraham, *supra;* Thomas v. Bracey, 10 Barr 164—cases where the action was not upon the illegal contract, or upon an instrument in execution of it, but was founded upon a new consideration. The distinction is well stated by Judge Washington, in Toler v. Armstrong, 3 Wash. C. C. R. 297, affirmed in the Supreme Court U. S., 11 Wheat. 258. The present case is free of difficulty, the money represented by the bill arising directly upon the contract to be paid by one party to another party to the contract in execution of its terms. The bill itself is therefore tainted by the illegality, and no recovery can be had upon it.

The judgment is therefore affirmed.