## Philadelphia Cleaners & Dyers Association, Inc., v. Dollar Cleaners & Dyers, Inc., et al.

*Leon J. Obermayer, George B. Clothier,* and *Benjamin Byer,* for plaintiff.

*Abram Wernick* and *Morris Wolf,* for defendant, Dollar Cleaners and Dyers, Inc.

*Paul Reilly,* for defendants, Original Rainbow Cleaners and Dyers and the Central Cleaning and Dyeing Company.

LAMBERTON, J., November 3, 1933.—Philadelphia Cleaners & Dyers Association, Inc. (hereinafter called the association), acting on behalf of itself and on behalf of all and each of its members individually, filed a bill in equity against Dollar Cleaners & Dyers, Inc. (hereinafter called Dollar Cleaners), Original Rainbow Cleaners & Dyers (hereinafter called Rainbow Cleaners), and Michael

Boyajian, individually and trading as Central Cleaning & Dyeing Company (hereinafter called Central Company). There were also joined as parties defendant Cleaning and Dye House Drivers' Union (hereinafter called the drivers' union), Cleaners, Dyers, Spotters, and Pressers Union (hereinafter called the pressers' union), and 38 other individuals and corporations, members of the association.

The bill avers that the association is a Pennsylvania corporation of the first class, whose membership comprises the greater part of the cleaning and dyeing industry in the City of Philadelphia, its object being to promote the best interests of that industry, to prevent unfair competition, etc.; that defendant Dollar Cleaners is a Pennsylvania corporation and a member of the association, engaged in the business of cleaning and dyeing, etc., in the City of Philadelphia; that defendant Rainbow Cleaners is a Pennsylvania corporation and a member of the association, and is likewise engaged in the business of cleaning and dyeing, etc., in the City of Philadelphia; that defendant Michael Boyajian is a member of the association and is engaged in the business of cleaning and dyeing, etc., in the City of Philadelphia; that all the other defendants are joined as parties defendant to complete the record, because they are parties signatory to a certain agreement providing the basis for the relief asked, but that no complaint is made against them or any of them; that in August 1933, the cleaning and dyeing industry was faced with a serious crisis, due to cutthroat competition, low prices, low wages, etc., which finally resulted in a wide-spread strike; that thereupon the association entered into negotiations with the representatives of the dissatisfied employes, now organized as the drivers' union and the pressers' union, and with its various members, for the amicable settlement of the existing controversies; that as the result of said negotiations on August 31, 1933, an agreement was entered into between the association, acting on behalf of all of its members, each of its members individually, the drivers' union, and the pressers' union, a copy of which agreement is attached to the bill; that said agreement was entered into in anticipation of the President's approval of a code of fair competition for the cleaning and dyeing industry; that said agreement provided for a fixed schedule of minimum prices to retailers and customers, which wages and prices were fair, reasonable, and proper; that all the parties, except the three principal defendants, have fully and faithfully performed the covenants contained in said agreement; that the three principal defendants have abandoned the schedule of prices fixed by said agreement and have charged lower prices than those fixed; that by reason of said action the cleaning and dyeing industry is again faced with a serious crisis, the members of the association, except the three principal defendants, are being driven out of business and threatened with insolvency, and the two labor unions are threatening to call another strike; that wages and working conditions cannot be maintained if prices are reduced; and that by reason of such action of the three principal defendants the association and the other members thereof have suffered great pecuniary damages through loss of profits and loss of business. The bill then prays that the three principal defendants be enjoined from violating in Pennsylvania the terms of said agreement, and particularly from charging in Pennsylvania prices lower than those fixed in the schedule contained in said agreement.

The agreement in question, a copy of which is attached to the bill of complaint, provides that members of the association shall employ only union labor and sets forth in detail the conditions of labor and the relations between the members of the association and the labor unions; that if a new plant opens the employes of such new plant shall be unionized; that the union shall not enter

into any contracts with other employers on terms more favorable to such employers than those contained in the agreement; that a minimum wholesale and retail price schedule for cleaning and dyeing service shall be set up in accordance with the schedule attached to the agreement; that no workers shall continue to work for an employer who charges less than the prices so fixed; that no wholesaler shall provide service to a retailer who charges less than the prices fixed; that a permanent board of arbitration shall be established, and that all complaints, grievances, misunderstandings, and questions concerning the interpretation of the agreement shall be submitted to such board for decision; that a council shall be established to which shall be submitted all matters pertaining to the industry, including the setting up of wholesale and retail prices, and if the council cannot unanimously agree, the question shall be submitted to the board of arbitration; that wages, hours, and conditions of labor shall be as set forth at length in the agreement; that the agreement shall continue in force for 2 weeks, during which time a permanent agreement shall be drawn containing substantially the same provisions; and that in case the permanent agreement is not drawn or is not agreed to the present agreement shall continue in force until January 31, 1934.

This agreement was signed by the association and all the parties defendant. Attached thereto is a detailed list of charges to be made in connection with every conceivable service rendered by the cleaning and dyeing industry. To this bill in equity the three principal defendants filed preliminary objections, which are now before us for decision.

The objections are as follows:

1. The bill discloses no financial interest in the association and no property right of any kind affected thereby, and therefore the association has no standing to maintain this bill. This is hardly true in view of the fact that the association filed the bill on behalf of itself and on behalf of all and each of its members individually. It might be better practice, however, to join these members as parties plaintiff rather than as parties defendant.

2. The agreement itself contains exclusive provisions regarding the method of enforcing the same, to wit, by arbitration, and therefore this proceeding is improper. It would be well if the bill should state what proceedings have been taken toward arbitration, as provided in the agreement, or why no proceedings have been taken, if such is the case.

3. No joint or concerted violation of the agreement is averred, and therefore separate bills should be filed against each defendant. We consider this objection without merit. The action against all three defendants is based on the same agreement for the same cause, and no good purpose would be served by having three bills of complaint instead of one.

4. The bill itself shows that the agreement in question was of a temporary nature, to be in force for 2 weeks only, unless the parties thereto should fail to execute a permanent agreement, in which case the temporary agreement was to continue in effect until January 31, 1934; and there is no averment in the bill that the temporary agreement is still in force. This is a valid objection, which can probably be taken care of by amendment.

5. The bill shows on its face that the agreement, violation of which it is sought to enjoin, is unenforcible in a court of equity, because it is contrary to public policy. This is the vital point at issue and must be considered at length.

The only relief asked in the bill is that defendants be restrained from charging prices lower than those fixed in the agreement. The bill shows that there were 44 signers to the agreement, 1 of whom is complainant, 2 of whom are labor unions and 41 of whom are individuals and corporations engaged in the

cleaning and dyeing business in and around Philadelphia. The bill itself avers that the parties signatory comprise "the greater part of the cleaning and dyeing industry serving the City of Philadelphia and its environs." At the argument it was stated that 85 percent of the cleaning and dyeing business in and around Philadelphia is done by these parties.

The question involved is whether such a price-fixing agreement is contrary to public policy, for if contrary to public policy equity will not enforce it. Since this is an intrastate matter, it is to be decided in accordance with the law of the State of Pennsylvania. It is our opinion that the case of Nester et al. v. Continental Brewing Co. et al., 161 Pa. 473, states that law. It was there stated that any agreement which is injurious to the public interest is against public policy, and that an agreement which eliminates free competition and constitutes fixed prices is necessarily injurious to the public. This was a principle of the common law in England. It was specifically stated to be the law of Pennsylvania in 1871, in the case of The Morris Run Coal Company v. The Barclay Coal Company, 68 Pa. 173; in 1894, in Nester et al. v. Continental Brewing Co. et al., supra; was apparently still the law in 1918, as indicated in the case of Ford Motor Co. v. Quinn, 70 Pa. Superior Ct. 337; and in 1928, as indicated in Ad-Lee Company v. Meyer, 294 Pa. 498. The agreeement in question has for its very purpose the elimination of free competition and the fixing of prices.

Counsel for complainant argues that only unreasonable restraints of trade are illegal and that the question at issue is the reasonableness of the prices fixed. If this is true the legality or illegality of the agreement could only be determined after hearing. This would impose upon the courts the burden of determining proper elements of cost and profit in each case, including proper payment for labor. In effect, the courts would fix wages and profits. This is not a judicial function under our system of government. This is well stated in the words of Justice Stone in the case of United States v. Trenton Potteries Co. et al., 273 U. S. 392, 398, where he said: "Moreover, in the absence of express legislation requiring it, we should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies."

Counsel for complainant contends that the cleaning and dyeing industry is not a trade; that the restraint of trade, which is illegal in Pennsylvania, is concerned only with the buying and selling of commodities, whereas what is being sold here is not a commodity but service. This argument was specifically answered very recently by the Supreme Court of the United States in Atlantic Cleaners & Dyers, Inc., et al., v. United States, 286 U. S. 427, a case exactly analogous to that now at issue.

The point most strongly pressed by counsel for complainant is that the law above cited is old; that the law should progress; and that what was against public policy 40 years ago is in accord with public policy today. In support of this position, he cites the dissenting opinions of several very able judges, but it is a novel proposition to ask this court to follow the minority rather than the majority opinions of the appellate courts.

It is true that the law must progress, so as to keep abreast of changing conditions. It is true that the public policy of our early days may not be the public policy of today. It is essential, however, that our law should be certain, and it is therefore essential that, when changes in the law are to be made because of a change in public policy, those changes should be in a straight, progressive,

line, and should not fluctuate with temporary public clamor or with the personal opinion or philosophy of a particular judge. A radical change in the law of Pennsylvania, as it has been heretofore stated, would be required in order that price-fixing agreements might be held legal. The obvious and by far the best way to accomplish such change would be by an act of assembly. This would leave to the law that certainty which is so necessary for the proper administration of justice. It is significant, however, that since the decision of our Supreme Court in the case of The Morris Run Coal Company v. The Barclay Coal Company, supra, in 1871, we have had a constitutional convention, a new Constitution, and perhaps thirty or more sessions of the legislature, and yet nothing has been done to change the law as there set forth.

It is true that the law of Pennsylvania on this point does not depend on statute but on public policy, and since our courts have declared what that policy is our courts would have the power, in the absence of statute, to declare that the policy had changed. But whether public policy on any point has changed, or should change, is a question on which one judge may think one way and another judge may think another. It depends upon political philosophy, on which even judges do not agree. It involves the overthrow of the decisions of our Supreme Court. If a lower court judge could do that on one subject, he could do it on many, and one lower court judge might well hold one way, and another lower court judge might hold another. This would mean that a judge, in deciding any case involving public policy, need not consider what the law is but what he thinks it should be. There would be no certainty and no continuity in our decisions. It is therefore essential that, when the law of this State is to be changed on the ground that public policy has changed, such change should be declared by an appellate rather than by a lower court, so that the change may at once be certain and uniform.

But even had this court the power to say that public policy has changed and that price-fixing agreements are now legal, it would not do so. We are firmly of the opinion that such a holding would be a step backward rather than a step forward. The entire development of our law has been on the theory that the public must be protected against combinations which injure the public. If the cleaners and dyers can fix prices by agreement, so can dealers in every other commodity, except possibly those affected with a public interest. The public would be helpless against such oppression. Every strike could be easily settled. The strikers would be paid more money, and the employers by agreement among themselves would raise the price to the public. This would in turn cause more strikes for higher wages, so that we would have a continual procession of strikes, increased wages, increased prices by agreement, more strikes, and the same thing over and over again, and the courts would be asked to restrain anybody who sought to sell to the public below the prices so pyramided. Such a system would oppress the public and would in fact bring no labor peace.

Counsel for complainant argues that the making of this agreement was in accordance with the policy of the National Recovery Act. A sufficient legal answer would be that Pennsylvania is still a sovereign State, and that Congress has no power, nor has the President power under a law of Congress, to declare the policy of Pennsylvania in such a matter. If the public policy of the State of Pennsylvania is to be changed to accord with Federal legislation, our legislature must make the change. But, brushing aside this legal fact, it is nowhere averred, neither was it argued, that this agreement has had any approval from officials under the National Recovery Act, or even that offi-

cials under the National Recovery Act are cognizant of its existence. Viewing the matter from a philosophic rather than a legal viewpoint, there is a vast difference between the fixing of prices by a governmental organization, which presumably will act with fairness to the employe, the employer, and the public, and the fixing of prices by voluntary action of employer and employe, who would be less than human if they did not place their own interests in the foreground and the interests of the public in the background.

The final argument of counsel for complainant is that the law is not favorably disposed toward contract breakers. That is true. We have no sympathy with these particular defendants. But this question was disposed of by Lord Mansfield, when he said in the case of Holman v. Johnson, 1 Cowper 341, 343:

"The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this; ex dolo malo non oritur actio. No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causâ, or the transgression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

The above was quoted with approval in the case of Nester et al. v. Continental Brewing Co. et al., supra, and as recently as 1928, in the case of Ad-Lee Company v. Meyer, supra.

We are therefore of opinion that the agreement which complainant seeks to enforce is void as against public policy, and that this fact is obvious on the face of the bill and cannot be cured by amendment. The question then is, what action should this court take. Rule 48 of the Rules of Equity Practice provides for the filing of preliminary objections. Rule 49 provides that in case these objections are sustained, plaintiff shall have leave to amend his bill, except in one case there stated, which is not here relevant. But subdivision 7 of rule 48 provides that one of the grounds on which preliminary objections may be filed is "that, for any other reason, defendant should not be required to answer the facts averred, since he has a full and complete defence to plaintiff's claim, specifically stated, which does not require production of evidence to sustain it." Under the decisions of our courts in Gray v. Phila. & Reading Coal & Iron Co. et al., 286 Pa. 11, Long et al. v. Metzger et al., State Board of Medical Education, etc., 301 Pa. 449, and Smith v. Overseers of Public Schools of County of Philadelphia et al., 104 Pa. Superior Ct. 111, it has been held that, where the preliminary objection is based upon the above ground and is sustained by the court, the bill should be dismissed. The preliminary objections filed by Dollar Cleaners specifically come within subdivision 7 of rule 48, but the preliminary objections filed by the other two defendants do not come within this rule. We might, therefore, dismiss the bill as to defendant Dollar Cleaners and sustain the objections with leave to amend as to the other two defendants. We have consulted, however, with counsel for Dollar Cleaners and with counsel for complainant, and they have stated to us that it is their wish to secure a decision of our higher court upon the legality or illegality of the agreement in question, and that this can best be done if the complainant is given leave to file an amended bill, so that the comparatively immaterial matters first noted may be cured by amendment and the case may go to the higher court with the one point involved.

And now, to wit, November 3, 1933, the preliminary objections of Dollar Cleaners & Dyers, Inc., Original Rainbow Cleaners & Dyers and Michael Boyajian, individually and trading as Central Cleaning & Dyeing Company are sustained, with leave to complainant to file an amended bill of complaint within 15 days upon penalty of dismissal of the bill.