COMMONWEALTH *vs.* FREDERICK M. DYER & others.

Suffolk. November 8, 9, 10, 1921. — December 30, 1922.

Present: RUGG, C.J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Conspiracy. Monopoly. Food. Pleading, Criminal,* Indictment, Motion to quash, Motion to expunge. *Practice, Criminal,* Jury, Verdict, Exceptions. *Jury and Jurors. Verdict. Evidence,* Competency, Relevancy and materiality, Privileged communications, Admission. *Attorney and Client.*

Conspiracy as a criminal offence is established when the object of the combination is either a crime, or, if not a crime, is unlawful, or when the means contemplated are either criminal, or, if not criminal, are illegal, provided that, where no crime is contemplated either as the end or the means, the illegal but non-criminal element involves prejudice to the general welfare or oppression of the individual of sufficient gravity to be injurious to the public interest.

An indictment charged that the defendants between January 1, 1916, and February 3, 1919, when, by reason of conditions created by the World War, there was general scarcity of food-stuffs and of steam trawlers and other vessels available

for the catching of fish, engaged in a conspiracy to create a monopoly in fresh fish, to fix, regulate, control, and to enhance exorbitantly and unreasonably the price of fresh fish with intent "to injure, oppress, impoverish, cheat and defraud . . . divers persons and corporations . . . and the public in general." The means by which, it was alleged, the defendants intended to carry out their plans were (1) by the acquisition and by securing control of the assets, property and good will of divers corporations, partnerships and individuals and of other agencies theretofore engaged in catching, selling, storing and distributing fresh fish in Boston and the establishment thus of a monopoly of the fresh fish business; (2) by withholding fish from sale and controlling the sale thereof; (3) by keeping fish in storage in violation of the cold storage laws of the Commonwealth; (4) by sham bidding and sham selling as to fresh fish at auction on the fish exchange in Boston; (5) by causing to be published false quotations of sales of fresh fish; (6) by false representations as to scarcity of fresh fish; (7) by causing to be unlawfully and fraudulently issued within this Commonwealth by officers, agents and servants of a foreign corporation certificates of stock therein purporting and represented thereon to be fully paid and non-assessable shares of such stock but in truth issued for property conveyed at the behest of the conspirators to the corporation at prices grossly in excess of their value; (8) by causing dividends to be paid on fraudulently issued stock of such corporation; (9) by misrepresenting the value of property conveyed at the instance of the defendants to such corporation for issuance of stock; (10) by misrepresenting to the public that such stock was issued lawfully and for the fair value of property conveyed to the corporation therefor; (11) by eliminating competition in the fish business, and (12) by coercing others by threats and intimidation to join in the conspiracy and restraining their trade. *Held,* that the indictment properly charged a criminal conspiracy to do an unlawful act by means which in some particulars were unlawful and in some were criminal under our law.

In the modern and wider sense monopoly denotes a combination, organization or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market and to secure the power to control prices to the public harm with respect to any commodity which people are under a practical compulsion to buy. Per RUGG, C. J.

By the common law monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public. Following *Standard Oil Co.* v. *United States,* 221 U. S. 1.

Private monopoly of an essential article of food in time of war is unlawful in this Commonwealth.

It *was stated* by RUGG, C. J., that it should be noted, as an exception to any generalization, that monopolies in public utilities may be granted by the General Court in the public interests, subject to appropriate regulation for the general welfare.

Even if monopoly alone and without more at common law and under St. 1908, c. 454, § 1, be not considered a crime, it is illegal, void and against public policy, and a combination for the purpose of establishing a monopoly in an essential article of food and of raising its price excessively and unreasonably in time of war is highly inimical to the public welfare and is indictable as a conspiracy.

One of the means for compassing the end of the combination described in the above indictment was to be the holding of fresh fish in cold storage for a longer

period than twelve months without the consent of designated State officers. *Held,* that such conduct was a crime under St. 1912, c. 652 (see now G. L. c. 94, §§ 69–73).

Sham bidding and sham selling of fish at auction on the fish exchange in Boston, alleged in the indictment above described to have been one of the means for attaining the end of the combination, was a crime at common law.

Another means adopted for carrying out the above described conspiracy, false representations as to the scarcity of fresh fish, constituted an unlawful act of such nature that at the least a contract made in reliance upon such false representations might have been avoided. ·

Averments in the indictment above described as to the fraudulent issuance of stock in the Maine corporation organized as one of the means of carrying out the conspiracy and as to the fraudulent payment of dividends on such stock set forth means at least unlawful in the sense of being contrary to good faith and commercial honesty.

An allegation in the indictment above described that, as one of the means for carrying out the conspiracy, certificates of stock in a Maine corporation were fraudulently issued and sold to the public in this Commonwealth as fully paid and legal was sufficient as matter of criminal pleading.

In an indictment for criminal conspiracy, a general description of illegal means employed by the defendants by terms of recognized meaning in law is sufficient without the particularity which might be necessary in an indictment for the substantive crime.

To indict one for engaging in a conspiracy seeking to acquire a monopoly and thereby to enhance unreasonably the price of a given article is to charge him with a specific offence in plain words and such an indictment is not open to the objection that it was too vague and indefinite to constitute a proper criminal charge.

The facts, that some of the means alleged to have been used by the defendants in the indictment above described had no taint of illegality and that others were not set out with the detail which would be essential if they constituted the main crime, did not invalidate the indictment.

There was no fatal defect in the indictment above described by reason of duplicity or misjoinder.

An indictment charging several defendants with the offences described in St. 1912, c. 651, and in the words used in that statute, is sufficient in matter of form.

Defendants may be charged, in a single indictment containing several counts, with divers and distinct offences, whether felonies or misdemeanors, if the offences are of a kindred nature and subject the defendants to punishments of the same general character.

Two counts charging a criminal conspiracy at common law to promote by unlawful means a monopoly in fish inimical to the public welfare, and fourteen counts charging violations of G. L. c. 93, §§ 8–12, may be joined in a single indictment against thirty individuals.

The indictment above described named three persons in several counts as co-conspirators with the defendants with an averment that no indictment was found against these three for the reason that they "testified and produced evidence before a committee of the General Court of Massachusetts upon a subject referred to said committee relating to matters and things included within this presentment." The defendants moved that the above statement

be expunged and that because of it the indictment be quashed. The motions were denied. In his charge the judge instructed the jury that the statement was unnecessary and superfluous and that it could be disregarded. *Held,* that

(1) There was no legal harm to the defendants in naming all the conspirators and at the same time stating why accusation was not made against those omitted from the indictment;

(2) Although the statement did not set forth a substantive part of the crime and well might have been omitted, the defendants' motions were denied rightly, and their substantive rights were protected by the charge.

An entire panel of traverse jurors, who had been summoned by a special writ of *venire facias* for the trial of an indictment for criminal conspiracy at the "Third Session" of the Superior Court for criminal business in the county of Suffolk, was discharged. The trial judge then directed jurors to be called from two other sessions of the Superior Court then being held for criminal business in the court house for the same county and from those jurors five were chosen. Thereafter the remaining seven jurors were secured from jurors then in attendance at several civil sessions of the Superior Court being held for the same county. *Held,* that the proceedings following the discharge of the panel first summoned were regular under G. L. c. 212, §§ 12, 14; c. 234, § 27.

The sitting of the Superior Court each month for Suffolk County for criminal business is single and not several, each of the several sessions in which such business is conducted being a part of that single sitting.

The designation by the clerk of the Superior Court for criminal business in Suffolk County, in writs of *venire facias* issued to jurors, of the particular session of the single sitting held each month for the county of Suffolk at which the jurors shall attend is a matter of convenience and does not constitute that session a special sitting nor those jurors a special jury.

At the trial of the indictment above described, evidence, relating to several specific instances as well as to general practices occurring after the alleged conspiracy was formed and tending to indicate that some of the defendants, when they and the business concerns for whom they acted had quantities of fish ample for their needs, bid upon fares of fish merely for the purpose of keeping up the price, could not be pronounced inadequate to warrant the submission to the jury of the question, whether the defendants used such means in carrying out the conspiracy.

Evidence relating to obliteration of marks on packages showing dates of putting fish in refrigeration, to taking fish from one cold storage place and putting it in another, to the acquisition of cold storage plants, to observations by police officers and conversations by them with some of the defendants which were susceptible of being treated as admissions, was *held* to have been sufficient to support the portion of the indictment relating to violation of the cold storage laws, and was competent for that purpose.

G. L. c. 266, § 66, is a penal statute and is not to be extended by construction beyond its fair implications.

G. L. c. 266, § 66, plainly prohibits only the manual making out and handing over of the physical thing known as a certificate of stock in fraud to one having no right to it and is not aimed at directors voting to instruct the proper ministerial officers to issue stock to promoters, who, by receiving the same in return for property sold by them to the corporation at a secret profit, violate their fiduciary obligations to the corporation.

The allegation of the counts of the indictment above described which charged criminal conspiracy at common law and stated as one means of accomplishing its ends a fraudulent issue of stock as a means to accomplish the conspiracy were confined by the trial judge in submitting the case to the jury to two particulars: (1) whether there was a fraudulent issue of stock in the Maine corporation to a certain one of the defendants, who was the main promoter of the scheme, when he was not entitled thereto, in violation of R. L. c. 208, § 57; (2) whether some or all of the defendants voted to take from the treasury of the Maine corporation money obtained from the exorbitant prices of fish and pay it as dividends to holders of stock who had no title to it. There was evidence tending to show that the defendant above designated was the organizer and promoter of the Maine corporation, that in acquiring as a part of the alleged conspiracy the assets of a Massachusetts corporation engaged in merchandising fish, votes were passed without investigation or inquiry by the directors of the Maine corporation who were his nominees, and stock was issued to him in such a way that he made a large secret profit in the purchase from the Massachusetts corporation, which, in violation of his duty as an officer of the corporation, he did not disclose to stockholders, and that the other defendants shared in the scheme. The trial judge left the case to the jury under instructions that, if the promoter defendant sold property, which he had procured from the Massachusetts corporation, to the Maine corporation at a profit in return for its stock without pursuing one of the methods by which, through full disclosures and *bona fide* conduct, a promoter may secure perfect title to stock received in payment of such sale, then there might be a verdict of guilty as to those defendants who conspired to cause that transaction to come to pass, provided its purpose was to enhance unreasonably the price of fresh fish and thus to cheat the public. *Held*, that, whatever might be said as to the conduct of the defendants when assailed in a civil suit, no violation of R. L. c. 208, § 57 (now G. L. c. 266, § 66), was shown by the evidence, and consequently there was error in the trial of the common law counts in the indictments.

A malevolent purpose is not an essential element of the crime prohibited by St. 1912, c. 651, § 2.

St. 1912, c. 651 (now G. L. c. 93, §§ 8–12), is not unconstitutional.

Evidence tending to show that the defendants in the counts of the indictment above described alleging violation of St. 1912, c. 651, § 2, were actuated in their conduct by a purpose to destroy the business of other dealers on the fish pier in Boston who declined to come into their combination, was found in threats to various dealers, "It is policy for you to get in, in out of the wet;" "We will take care of you;" "We," meaning the defendants, their corporation and their allies, "will put . . . [certain competitors] on the bum;" the "second preferred stock was going fast and that 'those who didn't get aboard quick would get left';" that they wanted the "live ones;" that "some of these concerns aren't in very good financial circumstances, and it is only a question of time when they will have to get out."

At the trial of the indictment above described, evidence relating to activities of that defendant who was a promoter, in inducing those who handled over eighty-five per cent of the fish landed at the fish pier in Boston in 1916 to enter upon a scheme looking to a control of the business of procuring, refrigerating, distributing and selling fish through Boston, and of sixteen others of the defendants who joined with him, was *held* to warrant a finding that those defendants combined

for the purpose of creating a monopoly in violation of St. 1912, c. 651, § 2; and that those defendants were actuated by a purpose to establish a monopoly critically harmful to the public welfare.

Instructions to the jury at the trial of the above described statutory counts, that there was nothing illegal in the defendants planning by lawful means to do the largest business in producing, distributing, buying, selling and dealing in fish, and thereby to make a gain or profit; and that, if it was found that their purpose was that the Maine corporation should become a large producer and a large distributor of fish, and that, by increasing the efficiency of the business and by economies and savings effected, fish could be furnished at reasonable prices with profit, or if it was found that the acts, declarations and admissions of the defendants were reasonably susceptible of that construction, then the defendants were not guilty, were sufficiently favorable to the defendants.

At the trial of an indictment against thirty defendants charging a criminal conspiracy to accomplish the acts denounced by St. 1912, c. 651, § 2, such an association or combination may be found to exist from purely circumstantial evidence, which may be re-enforced by declarations, admissions or conduct of one of them in furtherance of the common object; and many facts of no consequence in isolation may be proved because of the persuasiveness of their united effect.

At the trial of the indictment above described,

(1) Evidence, admitted and tending to show that no information was given to the directors of the Maine corporation or to the fish dealers and others who became stockholders therein of the secret profits made by the promoter defendant in promoting that corporation and as to the means employed by him in selling stock, evidence as to the law of Maine touching promoters' profits, and other evidence of that nature bearing upon the alleged issue of stock in violation of R. L. c. 208, § 57, and payments of dividends thereon, ought to have been excluded;

(2) Evidence as to the methods of bidding for fish on the Boston fish exchange by dealers who were stockholders of the Maine corporation, and as to withdrawal of its fish for a time from the exchange and the consequences thereof as affecting the prices of fish and the resultant advantages to the Maine corporation, was relevant and material;

(3) Evidence as to the organization, capital stock and corporate powers of the Maine corporation, and as to the acquisition of subsidiary companies was competent, relevant and material; and much of the evidence as to records, although remote, could not be said to have prejudiced the substantial rights of the defendants;

(4) Evidence as to the acquisition of control of a cold storage plant at Portland, Maine, and the use made of its facilities was relevant;

(5) Testimony as to the interest of the Maine corporation as lessee of a part of T Wharf in Boston and the interest of one of the defendants in another fish store there located was admissible;

(6) Testimony by an attorney for some of the defendants which related to conferences concerning the proposed commission of a crime by the client in furtherance of the conspiracy properly was admitted;

(7) Evidence tending to show what amounts were paid, as compensation for services rendered to the defendants, to an attorney who was a witness and was alleged to be a co-conspirator was admissible in the discretion of the trial

judge, where the attorney was alleged to be one of those who participated in the illegal combination although he was not indicted;

(8) Evidence as to hale of vessels written on the blackboard of the fish exchange, in connection with the method of business there prevailing and the means available to fish buyers as to the state of the market and the prices based upon the information there displayed, could not be said to have been admitted erroneously;

(9) Testimony given by one of the defendants in another proceeding respecting the matters in issue under this indictment was admissible against him as admissions;

(10) Copies of a paper published under the authority of the Maine corporation, containing matter showing the corporation's business methods and assertions in its name tending to show monopoly, were admissible as indicating the execution of a purpose to establish a monopoly;

(11) A witness, who had been long in the fish business in Boston and for several years had been statistician for the federal government, rightly was permitted to give computations tending to indicate monopoly, made from the books of the fish exchange which were in court.

There is no privilege between an attorney and his client as to conferences which concern the proposed commission of a crime by the client.

The factors employed in the establishment and maintenance of a monopoly are so numerous and shifting as to have slight significance each standing alone and yet to possess convincing force in combination.

Numerous rulings by the trial judge, at the trial of the indictment above described, admitting evidence subject to the defendants' exceptions on the promise of the assistant district attorney that it would be connected with the defendants or some of them, were interpreted as meaning that the evidence was admitted on that condition, and if the defendants deemed at the close of the evidence that no such connecting evidence had been introduced, it was the duty of the defendants to move to have the evidence stricken out; and such exceptions in the several instances were overruled, either because the evidence was competent, or because it was admissible in the discretion of the judge, or because it was harmless in its adverse effect upon the defendants or because it should have been but was not made the subject of motion by the defendants to strike it out and to direct the jury to disregard it.

A contention of the defendants that the judge who presided at the trial of the indictment above described had abdicated his function and had made the prosecuting officer the judge of the admissibility of evidence was *held* to have been utterly without foundation in fact.

The trial judge at the trial above described was *held* to have performed his duty to guard solicitously the rights of parties against improper arguments by counsel to the jury and to have given appropriate instructions with regard to certain arguments by the counsel for the Commonwealth.

Upon the return of the jury with their verdict at the trial of an indictment in several counts against thirty defendants, the clerk asked them if they had agreed upon their verdict. The foreman responded in the affirmative. The clerk then inquired of the foreman, *seriatim*, as to findings as to each defendant on the several counts, and the foreman responded, "guilty," or "not guilty," as the finding was. The defendants found not guilty then were discharged, the judge thanked the jurors, and the clerk asked, "The verdicts that I have read,

Mr. Foreman, is your verdict so you say, and so you all say, gentlemen, do you?" and the jurors answered "Yes." The jurors then left their seats and the court room, conversed with others present and had begun to disperse when they were recalled to the box and the clerk addressed them as to each defendant relating to the several counts of the indictment, "Gentlemen of the jury, hearken to your verdict as the court has recorded it. You upon your oaths do say that . . . [with a repetition of each finding]." *Held,* that there was no irregularity affecting the validity of the verdict.

It is the general rule that exceptions not argued are treated as waived.

This court exercises its power to correct genuine errors of law: ordinarily it spends no time in the elucidation of matters not deemed by those in interest as worthy of their own reasoning faculties.     ·

An indictment against thirty defendants contained sixteen counts, two charging a criminal conspiracy at common law in furthering a monopoly to the injury of the general public and fourteen charging a violation of St. 1912, c. 651, § 2.    As bearing upon the counts at common law, certain evidence was erroneously received, certain requests for rulings erroneously were refused and certain instructions erroneously were given to the jury as to alleged unlawful conduct of the defendants in taking a secret profit from the sale of the assets by a Massachusetts corporation to a Maine corporation which they had organized as a part of their monopolistic scheme. Evidence as to the establishment of the Maine corporation, the amount and classes of its capital stock, the nature of the property transferred to it and all other factors connected with it as an instrument calculated to produce and maintain a monopoly was admissible to prove the allegations of the statutory counts. The charge to the jury as to the statutory counts, while depending upon the portion of the charge as to common law counts for the definition of monopoly, was in other respects distinct and separate. *Held,* that

(1) The charge and the trial as to the statutory counts were not affected adversely to the defendants as matter of law by the errors as to the common law counts;

(2) As to the verdicts: while those rendered upon the common law counts were set aside, those on the statutory counts were allowed to stand, there being no reversible error as to them; and it *was ordered* that judgment might be entered upon the statutory counts provided a *nolle prosequi* was entered as to the common law counts;

(3) The case was to be treated, with respect to the two groups of counts so far as concerns verdicts and judgments, the same as if the trial had been had upon separate indictments for each charge;

(4) As to sentences: the defendants having been sentenced by a single sentence on all the counts and the execution of the several sentences having been stayed, and the defendants' exceptions sustained, the sentences were set aside.

INDICTMENT, found and returned on August 15, 1918, in sixteen counts against Frederick M. Dyer, otherwise known as F. Munroe Dyer, Joshua Paine, Joseph A. Rich, Ernest A. James, Willard R. Cox, Albert E. Watts, Ephraim N. Cook, John Burns, the younger of that name, William F. McKeon, Herbert A. Rich, Winfield S. Kendrick, Herbert F. Phillips, Fred G. Phillips, William E. Curran,

Simeon Atwood, the younger of that name, Alvin G. Baker, and Louis B. Goodspeed, and thirteen others, charging in the first and second counts a conspiracy at common law to create a monopoly in fresh fish, to fix, regulate, control, and to enhance exorbitantly and unreasonably the price of fresh fish, and thus to cheat and defraud the public; and in the third to sixteenth counts, inclusive, violations of St. 1912, c. 651, in that the defendants "did combine in the business of dealing in and selling goods and commodities in general use, to wit, fresh fish, for the purpose of unlawfully destroying the trade and business of certain corporations and persons then and there engaged in selling goods and commodities in general use, to wit, fresh fish, in said Commonwealth, to wit [naming specifically such "certain corporations and persons"]."

The defendants filed motions to quash the indictment. The case was heard upon the motions by and was tried upon the merits before *Sanderson*, J. Material evidence and rulings by the judge are described in the opinion.

Upon the return of the jury to the court room, the clerk addressed them saying, "Gentlemen of the jury, have you agreed upon your verdict?" The foreman answered, "We have." The clerk then said, as to each defendant, in order, "What say you Mr. Foreman, as to [such defendant], upon the first and second counts, is he guilty or not guilty?" and the foreman responded, as to each of the defendants specifically named above, "guilty," and as to the others, "not guilty." The clerk then made the further inquiry, "Upon the third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and sixteenth counts?" and corresponding answers were made by the foreman. After the entire list of defendants thus had been gone through, those found not guilty had been discharged, and the presiding judge had thanked the jury for their attention to the case, the clerk said "The verdicts that I have read, Mr. Foreman, is your verdict so you say, and so you all say, gentlemen, do you?" and the jurors answered, "Yes." The jurors then left their seats and the court room, conversed with others present and had begun to disperse when they were recalled to their seats and the clerk began to inquire as to each defendant as follows: "Gentlemen of the jury, hearken to your verdict as the court has recorded it. You upon your oaths do say that [naming

the defendant in each case] is guilty of the first and second counts of the indictment, and also guilty of the third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and sixteenth counts of the indictment?"

One of the counsel for the defendants found guilty then addressed the court as follows: "May it please the Court, I desire to enter our objection to the affirmation of the verdict at this time on the ground that the jury had already been discharged and had separated." The presiding judge made no reply. The clerk then proceeded to call the names of all the remaining defendants, and the verdicts as previously announced by the foreman were all affirmed by the jurors as above. No exception to this procedure was saved on the record.

Other material facts as to the trial are described in the opinion. The defendants above specifically named alleged exceptions.

*H. F. Hurlburt & D. E. Hall,* for all the defendants excepting Curran and Atwood.

*A. P. Gay & J. H. Devine,* for the defendants Curran and Atwood.

*J. W. Allen,* Attorney General, *H. C. Attwill & A. C. Webber,* (*C. W. Mulcahy & C. H. Waterman* with them,) for the Commonwealth.

RUGG, C. J. The first two counts of this indictment are framed on the common law. Numerous defendants therein are charged with conspiracy to create a monopoly in fresh fish, to fix, regulate, control, and to enhance exorbitantly and unreasonably the price of fresh fish, and thus to cheat and defraud the public. By way of inducement it is alleged that the principal place within this Commonwealth and New England where fresh fish was bought and sold was the exchange maintained on the Fish Pier in Boston by the New England Fish Exchange, where the privilege of buying and bidding was restricted to the stockholders and to a limited number of persons licensed by the exchange, and that the prices there prevailing controlled the prices throughout New England, and that before the acts of the defendants there was free competition on the exchange, of which they were stockholders, between the persons, firms and corporations subsequently absorbed in the Bay State Fishing Company, a corporation organized by the defendants under the laws of Maine, and that by reason of con-

ditions created by the great war there was general scarcity of food-stuffs and of steam trawlers and other vessels available for catching of fish, and that fresh fish was a perishable article of food of prime necessity, merchantable as such for a brief period only after being caught, and indispensable to the public at fair and reasonable prices. The intent of the defendants in engaging in the conspiracy is alleged to be "to injure, oppress, impoverish, cheat and defraud . . . divers persons and corporations . . . and the public in general." The time of the conspiracy as fixed by specifications is between January 1, 1916, and February 3, 1919. The means by which it is in these two counts alleged that the defendants intended to carry out their plan are (1) by the acquisition and by securing control of the assets, property and good will of divers corporations, partnerships and individuals and of other agencies theretofore engaged in catching, selling, storing and distributing fresh fish in Boston and thus the establishment of a monopoly of the fresh fish business; (2) by withholding fish from sale and controlling the sale thereof; (3) by keeping fish in storage in violation of the cold storage laws of the Commonwealth; (4) by sham bidding and sham selling as to fresh fish at auction on the fish exchange in Boston; (5) by causing to be published false quotations of sales of fresh fish; (6) by false representations as to scarcity of fresh fish; (7) by causing to be unlawfully and fraudulently issued within this Commonwealth by officers, agents and servants of a foreign corporation certificates of stock therein purporting and represented thereon to be fully paid and non-assessable shares of such stock but in truth issued for property conveyed at the behest of the conspirators to the corporation at prices grossly in excess of their value; (8) by causing dividends to be paid on fraudulently issued stock of such corporation; (9) by misrepresenting the value of property conveyed at the instance of the defendants to such corporation for issuance of stock; (10) by misrepresenting to the public that such stock was issued lawfully and for the fair value of property conveyed to the corporation therefor; (11) by eliminating competition in the fish business; (12) by coercing others by threats and intimidation to join in the conspiracy and restraining their trade.

The remaining fourteen counts of the indictment all are founded on St. 1912, c. 651, and charge violation of its terms. That statute

denounces under pain of severe penalty a combination of persons, firms, associations or corporations "for the purpose of destroying the trade or business" of another "engaged in selling goods or commodities and of creating a monopoly within this Commonwealth." Each of these fourteen counts charges the defendants with combining in the fish business for the purpose of destroying the trade and business of named persons, firms or corporations engaged in selling fresh fish and of creating a monopoly in fresh fish within the Commonwealth.

The defendants filed motions to quash the indictment and the several counts thereof, assigning a large number of grounds.

1. The principles by which to determine the elements essential to conspiracy as a common law crime are settled in this Commonwealth. The subject was discussed at large by Chief Justice Shaw in *Commonwealth* v. *Hunt,* 4 Met. 111, where at page 123 it was said, "a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. We use the terms criminal or unlawful, because it is manifest that many acts are unlawful, which are not punishable by indictment or other public prosecution; and yet there is no doubt, we think, that a combination by numbers to do them would be an unlawful conspiracy, and punishable by indictment. Of this character was a conspiracy to cheat by false pretences, without false tokens, when a cheat by false pretences only, by a single person, was not a punishable offence. *Commonwealth* v. *Boynton,* [see a statement of this case in 3 Law Reporter, 295, 296] . . . So a combination to destroy the reputation of an individual, by verbal calumny which is not indictable. So a conspiracy to induce and persuade a young female, by false representations, to leave the protection of her parents' house, with a view to facilitate her prostitution. *Rex* v. *Lord Grey,* 3 Hargrave's State Trials, 519. But yet it is clear, that it is not every combination to do unlawful acts, to the prejudice of another by a concerted action, which is punishable as conspiracy. . . . Several rules upon the subject seem to be well established, to wit, that the unlawful agreement constitutes the gist of the offence, and therefore that it is not necessary to charge the execution of the unlawful agreement. *Commonwealth* v. *Judd,* 2 Mass. [329,] 337.

And when such execution is charged, it is to be regarded as proof of the intent, or as an aggravation of the criminality of the unlawful combination. Another rule is a necessary consequence of the former, which is, that the crime is consummate and complete by the fact of unlawful combination, and, therefore, that if the execution of the unlawful purpose is averred, it is by way of aggravation, and proof of it is not necessary to conviction; and therefore the jury may find the conspiracy, and negative the execution, and it will be a good conviction. And it follows, as another necessary legal consequence, from the same principle, that the indictment must — by averring the unlawful purpose of the conspiracy, or the unlawful means by which it is contemplated and agreed to accomplish a lawful purpose, or a purpose not of itself criminally punishable — set out an offence complete in itself, without the aid of any averment of illegal acts done in pursuance of such an agreement; and that an illegal combination, imperfectly and insufficiently set out in the indictment, will not be aided by averments of acts done in pursuance of it." This case was cited with approval and part of the opinion quoted in *Pettibone* v. *United States,* 148 U. S. 197, 203.

The principles thus declared were affirmed in *Commonwealth* v. *Waterman,* 122 Mass. 43, where it was said at page 57, "It is not always essential that the acts contemplated should constitute a criminal offence, for which, without the element of conspiracy, one alone could be indicted. . . . It is said to be sufficient if the end proposed, or the means to be employed, are by reason of the power of the combination, particularly dangerous to the public interests, or particularly injurious to some individual, although not criminal." *Commonwealth* v. *Stuart,* 207 Mass. 563, 570. "Of the general proposition, that certain kinds of conduct not criminal in any one individual may become criminal if done by combination among several, there can be no doubt." *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* 23 Q. B. D. 598, 616, quoted with approval in *Burnham* v. *Dowd,* 217 Mass. 351, 358, 359. *Martell* v. *White,* 185 Mass. 255, 260. *Commonwealth* v. *Harris,* 232 Mass. 588, 591. *Attorney General* v. *Tufts,* 239 Mass. 458, 493. The decisions of *Commonwealth* v. *Eastman,* 1 Cush. 189, *Commonwealth* v. *Shedd,* 7 Cush. 514, *Commonwealth* v. *Prius,* 9 Gray, 127, and *Commonwealth* v. *Wallace,* 16 Gray, 221, are not at variance. They all

arose on questions of pleading. What was said in the first two of these cases as to the criminal end or criminal means related to particular facts before the court and was not intended to narrow the general and careful statement in *Commonwealth* v. *Hunt*, 4 Met. 111. See *Swan* v. *Justices of the Superior Court*, 222 Mass. 542, 545.

The law has never declared otherwise than by the decision of specific cases as they arise the unlawful but not criminal acts which when made the object of co-operative design between two or more persons constitute criminal conspiracy. Manifestly the instances given by Chief Justice Shaw in 4 Met. at pages 123 and 124, were intended to be illustrative only and not exhaustive.

The great weight of authority in other jurisdictions is in harmony with the principle declared in *Commonwealth* v. *Hunt*, 4 Met. 111. That decision has been followed in many of the States of the Union. It is the consensus of opinion that conspiracy as a criminal offence is established when the object of the combination is either a crime, or if not a crime, is unlawful, or when the means contemplated are either criminal, or if not criminal, are illegal, provided that, where no crime is contemplated either as the end or the means, the illegal but non-criminal element involves prejudice to the general welfare or oppression of the individual of sufficient gravity to be injurious to the public interest. *Regina* v. *Howell*, 4 F. & F. 160. *Regina* v. *Parnell*, 14 Cox C. C. 508. *Rex* v. *Delaval*, Burr, 1434. *Regina* v. *Warburton*, L. R. 1 C. C. R. 274; *S. C.* 11 Cox C. C. 584. *Regina* v. *Aspinwall*, 2 Q. B. D. 48. *Levi* v. *Levi*, 6 C. & P. 239. *Rex* v. *DeBerenger*, 3 M. & S. 67. *Regina* v. *Hewitt*, 5 Cox C. C. 162. *Mifflin* v. *Commonwealth*, 5 Watts & Serg. 461. *State* v. *Buchanan*, 5 Har. & J. 317. *Quinn* v. *Leathem*, [1901] A. C. 495, 529. *State* v. *Burnham*, 15 N. H. 396, 402. *Crump* v. *Commonwealth*, 84 Va. 927. *State* v. *Hardin*, 144 Iowa, 264, 267. *State* v. *Davis*, 88 S. C. 229, 232. *State* v. *Assurance Co. of America*, 251 Mo. 278. *State* v. *Younger*, 1 Dev. (N. C.) 357. *State* v. *Gannon*, 75 Conn. 206, 210, 211. *Smith* v. *People*, 25 Ill. 17. *People* v. *Curran*, 286 Ill. 302, 305. *Lanasa* v. *State*, 109 Md. 602. *Ellzey* v. *State*, 57 Miss. 827, 829. *State* v. *Bienstock*, 49 Vroom, 256, 272. See Wright & Carson on "The Law of Criminal Conspiracies & Agreements," 50, 51, 110–124.

Referring first to the common law counts, — they conform to the principles of criminal conspiracy. The intent of the combination is alleged to be the oppression and injury of the public through the unreasonable enhancement of the price of a food-stuff of prime necessity for the people during the exigency created by the great war. The means by which it is alleged that the purpose was designed to be achieved are in some particulars unlawful and in others criminal under our law.

2. Monopoly in fresh fish is both an end and a means of the conspiracy as alleged because upon it depends the power to control and to enhance unreasonably the prices of fresh fish to the public harm. The earlier conception of a monopoly was a grant of an exclusive right from the sovereign power. That still defines with accuracy that which an inventor receives under the patent laws. In the modern and wider sense monopoly denotes a combination, organization or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market and to secure the power to control prices to the public harm with respect to any commodity which people are under a practical compulsion to buy. *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, 129. *United States* v. *Terminal Railroad of St. Louis,* 224 U. S. 383, 395. *United States* v. *E. C. Knight Co.* 156 U. S. 1, 16. *United Shoe Machinery Co.* v. *La Chapelle,* 212 Mass. 467, 480.

It was said by Chief Justice White in *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1, 51, 54, as the first of several generalizations flowing from "reference to the elementary and indisputable conceptions of both the English and American law," "That by the common law monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public." Without analysis of the authorities outside this Commonwealth we accept this as a complete summary of the law. A brief review of our own decisions leads to the conclusion that private monopoly of an essential article of food in time of war is unlawful in this Commonwealth. Contracts having a monopolistic tendency have been held to "expose the 'public to all the evils of monopoly," *Alger* v. *Thacher,* 19 Pick. 51, 54, to be "illegal," *Sampson* v. *Shaw,* 101 Mass. 145, 149, to be "to the prejudice of the public," and to be "forbidden

by the common law, and . . . held to be illegal," *Bishop* v. *Palmer,* 146 Mass. 469, 474, and to be "void as against public policy," *Gamewell Fire Alarm Telegraph Co.* v. *Crane,* 160 Mass. 50, 57. Monopolies have been said to be "hostile to the rights and interests of the public," *Taylor* v. *Blanchard,* 13 Allen, 370, 372, and "illegal," *Opinion of the Justices,* 211 Mass. 620, 622, *Folsom* v. *Lewis,* 208 Mass. 336, 338, *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.* 220 U. S. 373, 402. There is nothing at variance in *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353. The agreement which was there the subject of controversy was held to be for a lawful purpose without illegal means, but it was added (364), "When it appears that the combination is used to the public detriment, a different question will be presented from that now before us." This case was followed as authority without discussion in *Gloucester Isinglass & Glue Co.* v. *Russia Cement Co.* 154 Mass. 92, and is of course subject to the same limitation as to its scope.

It should be noted, as an exception to any generalization, that monopolies in public utilities may be granted by the General Court in the public interests, subject to appropriate regulation for the general welfare. *Boston & Lowell Railroad* v. *Salem & Lowell Railroad,* 2 Gray, 1, 32–34. *Weld* v. *Gas & Electric Light Commissioners,* 197 Mass. 556, 558. *Attorney General* v. *Haverhill Gas Light Co.* 215 Mass. 394, 398.

In addition to these judicial utterances, by St. 1908, c. 454, § 1 (see now G. L. c. 93, § 2), "Every contract, agreement, arrangement or combination in violation of the common law in that thereby a monopoly in the manufacture, production or sale in this Commonwealth of any article or commodity in common use is or may be created, established or maintained, . . . is hereby declared to be against public policy, illegal and void."

The courts of this country with singular unanimity concur in the conclusion that contracts and combinations to attain, create or maintain a monopoly such as is here charged "are against the policy of the law, and are therefore illegal and void." *Distilling & Cattle Feeding Co.* v. *People,* 156 Ill. 448, 490. *Connors* v. *Connolly,* 86 Conn. 641, 652. *State* v. *Standard Oil Co.* 49 Ohio St. 137, 185–187. *Cummings* v. *Union Blue Stove Co.* 164 N. Y. 401, 405. *State* v. *American Sugar Refining Co.* 138 La. 1005,

1019, 1020. *Pulp Wood Co.* v. *Green Bay Paper & Fiber Co.* 168 Wis. 400, 411, 412. *Fisher Flouring Mills Co.* v. *Swanson,* 76 Wash. 649, 657. *Richardson* v. *Buhl,* 77 Mich. 632, 658. *State* v. *Nebraska Distilling Co.* 29 Neb. 700, 715. *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Penn. St. 173, 183, 184. *Chapin* v. *Brown Bros.* 83 Iowa, 156. *Knight & Jillson Co.* v. *Miller,* 172 Ind. 27, 42. *Stewart* v. *Stearns & Culver Lumber Co.* 56 Fla. 570, 587. *Tuscaloosa Ice Manuf. Co.* v. *Williams,* 127 Ala. 110, 123. *State* v. *Duluth Board of Trade,* 107 Minn. 506, 526. *Bailey* v. *Master Plumbers,* 103 Tenn. 99. *Texas Standard Oil Co.* v. *Adoue,* 83 Texas, 650. *Pocahontas Coke Co.* v. *Powhatan Coal & Coke Co.* 60 W. Va. 508, 519–532. *Klingel's Pharmacy* v. *Sharp & Dohme,* 104 Md. 218, 230, 231. *State* v. *Stewart,* 59 Vt. 273. *People* v. *North River Sugar Refining Co.* 121 N. Y. 582. *Central Ohio Salt Co.* v. *Guthrie,* 35 Ohio St. 666. *Anderson* v. *Jett,* 89 Ky. 375. *People* v. *Milk Exchange,* 145 N.Y. 267. *Stockton* v. *Central Railroad,* 5 Dick. 52, 84, 85. *Brown & Allen* v. *Jacobs' Pharmacy Co.* 115 Ga. 429.

Stray expressions may be found in decisions to the effect that monopoly at common law is "a crime." See, for example, Chief Justice Parker in *Mitchel* v. *Reynolds,* 1 P. Wms. 181, 193, quoted in *Taylor* v. *Blanchard,* 13 Allen, 370, 373; *Rex* v. *Norris,* 2 Kenyon, 300; *Rex* v. *Waddington,* 1 East, 143. There are also judicial statements to the effect that, apart from statute, contracts or combinations in restraint of trade were not crimes at common law. *United States* v. *Addyston Pipe & Steel Co.* 29 C. C. A. 141, 148. *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* [1892] A. C. 25. *Hornby* v. *Close,* L. R. 2 Q. B. 153. Lord Campbell, C.J., in *Hilton* v. *Eckersley,* 6 El. & Bl. 47, 66. *Farrer* v. *Close,* L. R. 4 Q. B. 602, 612. Even if it be conceded, as was said in *Attorney General of Australia* v. *Adelaide Steamship Co. Ltd.* [1913] A. C. 781, at page 797, that "To make any such contract or combination unlawful it must amount to a criminal conspiracy, and the essence of a criminal conspiracy is a contract or combination to do something unlawful, or something lawful by unlawful means. The right of the individual to carry on his trade or business in the manner he considers best in his own interests involves the right of combining with others in a common course of action, provided such common course of action is undertaken

with a single view to the interests of the combining parties and not with a view to injure others," nevertheless the case at bar must be considered in the light of the allegation which permeates the common law counts that the combination was formed with an evil intent to oppress and injure the public. We consider this case on the footing that monopoly alone and without more at common law and under St. 1908, c. 454, § 1, is not a crime but is illegal, void and against public policy.

In any event the inquiry arises whether the illegal element in the monopoly here charged is of such nature as to render a combination for the purpose of establishing that monopoly a criminal conspiracy. By recurrence to the fundamental conception of conspiracy as a crime it is apparent that this monopoly involves prejudice to the general welfare of sufficient gravity to be injurious to the public interests. It seems to us manifest that a combination for the purpose of establishing a monopoly in an essential article of food and of raising excessively and unreasonably its price in time of war is highly inimical to the public welfare. The bald statement of the factors involved renders patent the harm to the public in manifold forms likely to ensue from such a monopoly. Enumeration of the general discontent, sufferings and other evils inevitable from the establishment of such a monopoly with such a purpose is not necessary to make plain its destructive and pernicious nature and its detriment to the public welfare. We are of opinion that a combination to create a monopoly for such a purpose and with such an intent is indictable as a conspiracy. This result follows from the considerations already stated and from the elements inherent in the situation.

It has been expressly held in *State* v. *Eastern Coal Co.* 29 R. I. 254, *State* v. *Craft,* 168 N. C. 208, *Chicago, Wilmington & Vermillion Coal Co.* v. *People,* 214 Ill. 421 (see *People* v. *Sheldon,* 139 N. Y. 251, 264), that an agreement or combination for the purpose of controlling a necessity of life or of creating therein a monopoly constitutes a crime at common law. We are not aware of actual decisions to the contrary.

3. One of the means for compassing the end of the combination is alleged to be holding fresh fish in cold storage for a longer period than twelve months without the consent of designated State

officers. This was made a crime by St. 1912, c. 652. (See now G. L. c. 94, §§ 69–73.)

4. Another means alleged was sham bidding and sham selling at auction on the fish exchange. This also constituted a common law crime. *Regina* v. *Lewis,* 11 Cox C. C. 404. *Rex* v. *DeBerenger,* 3 M. & S. 67. See *Gibbs* v. *Smith,* 115 Mass. 592.

5. False representations as to the scarcity of fresh fish constituted an unlawful act of such nature that at the least a contract made in reliance upon them might have been avoided. The averments as to the fraudulent issuance of stock in the Maine corporation organized as one of the means of carrying out the conspiracy and as to the fraudulent payment of dividends on such stock were means at least unlawful in the sense of being contrary to good faith and commercial honesty.

6. As matter of criminal pleading the allegation that certificates of stock in a Maine corporation were fraudulently issued and sold to the public in this Commonwealth as fully paid and legal was sufficient. Such conduct is made a crime by R. L. c. 208, § 57, G. L. c. 266, § 66. A general description of illegal means by terms of recognized meaning in law is sufficient without the particularity which might be necessary in an indictment for the substantive crime.

7. These counts of the indictment are not open to the objection that they are too vague and indefinite to constitute a proper criminal charge. They set out a conspiracy to establish a monopoly and to enhance unreasonably the price of a necessity of life. One of the evils of monopoly recognized from earliest times and emphasized in the present is an undue "enhancement of price." *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1, 54. The power to raise prices unreasonably is one of the inherent features which in general renders monopoly obnoxious to the public interests. To indict one for conspiracy to acquire a monopoly and thereby to enhance unreasonably the price of a given article is to charge him with a specific offence in plain words. It rests upon common law definitions of acts and of crimes, which afford the standard of criminality. That was settled by *Nash* v. *United States,* 229 U. S. 373, which is decisive upon this point in support of the present indictment. Its reasoning need not be restated. *Omaechevarria* v. *Idaho,* 246 U. S. 343. *Waters-Pierce Oil*

*Co.* v. *Texas,* 212 U. S. 86, 109, 110. The case at bar is distinguishable from *International Harvester Co. of America* v. *Kentucky,* 234 U. S. 216, and *Collins* v. *Kentucky,* 234 U. S. 634, 637, where the statute under review merely denounced a combination for the purpose "of fixing a price that was greater or less than the real value of the article," and from *United States* v. *Cohen Grocery Co.* 255 U. S. 81, and *Weeds, Inc.* v. *United States,* 255 U. S. 109, where the statute simply penalized making "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries." Those cases decided that the statutes were void because they established no standard of conduct susceptible of being known in advance so that one could conform his conduct to their terms.

Some steps are alleged in the indictment which have no taint of illegality. Others are not set out with the detail which would be essential if they constituted the main crime. These factors do not invalidate the indictment.

8. It is plain that there is no fatal defect by reason of duplicity or misjoinder in the common law counts. *Commonwealth* v. *O'Brien,* 12 Cush. 84. *Commonwealth* v. *Rogers,* 181 Mass. 184, 190. *Fromwerk* v. *United States,* 249 U. S. 204. *United States* v. *Rabinowich,* 238 U. S. 78. R. L. c. 218, § 31, now G. L. c. 277, § 31.

9. The fourteen statutory counts were framed under St. 1912, c. 651, G. L. c. 93, §§ 8–12, and follow in substance the words of the statute. This was enough to satisfy the requirements of criminal pleading. *Commonwealth* v. *Connelly,* 163 Mass. 539, 541. *Commonwealth* v. *Allison,* 227 Mass. 57.

10. The counts at common law and under the statute were properly joined in one indictment. *Commonwealth* v. *Rosenthal,* 211 Mass. 50, and cases there cited. *Commonwealth* v. *Darling,* 129 Mass. 112. *Pettes* v. *Commonwealth,* 126 Mass. 242. Without discussing the other grounds alleged, it is enough to say that the motion to quash was overruled rightly. R. L. c. 218, § 45, now G. L. c. 277, § 46.

11. Three persons were named in several counts as co-conspirators with the defendants with an averment that no indictment was found against these three for the reason that they "testified and produced evidence before a committee of the General Court of Massachusetts upon a subject referred to said committee relating to matters and things included within this pre-

sentment." The motion to expunge this statement from the indictment was denied rightly. If it be assumed in favor of the defendants but without so deciding that parts of an indictment may be expunged, it is plain that there was no occasion for such course in the case at bar. All the conspirators need not be named in an indictment. *Clune* v. *United States,* 159 U. S. 590, 593. *People* v. *Smith,* 239 Ill. 91, 108. *Jenkins* v. *Commonwealth,* 167 Ky. 544, 555, 556. *People* v. *Richards,* 67 Cal. 412. *People* v. *Mather,* 4 Wend. 229, 265, 266. There is nothing at variance with this principle in *Commonwealth* v. *Derry,* 221 Mass. 45; 47. See *Commonwealth* v. *Scott,* 123 Mass. 222, 235. The words, which were the subject of the motion to expunge, were not a substantive part of the crime and well might have been omitted. It was stated in the charge by the judge to the jury that they were unnecessary and superfluous and could be disregarded. *Commonwealth* v. *Pray,* 13 Pick. 359. But there was no legal harm to the defendants in naming all the conspirators and at the same time stating why accusation was not made against those omitted from the indictment. *Commonwealth* v. *Knapp,* 10 Pick. 477, 478. There was no error in denying the motion to quash on this ground. All the substantive rights of the defendants were protected by the charge. *Commonwealth* v. *Pray,* 13 Pick. 359. R. L. c. 218, § 34 (see now G. L. c. 277, § 34). *Commonwealth* v. *Peretz,* 212 Mass. 253, 255.

12. Persons were duly drawn and notified to serve as traverse jurors at the sitting of the Superior Court to be holden for criminal business in Suffolk County on the first day of February "at the Third Session thereof" and to attend court on the tenth day of February, 1919. By reason of the illness of the judge first assigned to hold that sitting, those jurors were notified "not to appear until sent for" and they did not attend until the twenty-fourth day of the same month. The defendants then filed a challenge to the array based on these facts. It was allowed, the Attorney General so requesting, and the jurors so summoned were excused. The propriety of those proceedings is not before us. Thereupon the judge directed jurors to be called from two other sessions of the Superior Court then being held for criminal business in the court house for the same county and from those jurors five were impanelled, and thereafter from jurors then in attendance at several civil sessions of the Superior Court being held for the

same county, the remaining seven were secured. The defendants duly excepted to these proceedings on the ground that they were not permissible under the statutes.

The pertinent statutory provisions (R. L. c. 157, § 24, as amended by St. 1902, c. 456, § 1, see now G. L. c. 212, § 14), require that sittings of the Superior Court be held for the county of Suffolk "for civil business, on the first Mondays of January, April, July and October; for criminal business, the first Monday of every month" (R. L. c. 157, § 29, as amended by St. 1912, c. 209, now G. L. c. 212, § 20); that "In the counties in which separate sittings of the Superior Court are established for civil and criminal business, criminal cases only shall be tried by jury at the criminal sittings, and civil cases only at the civil sittings; but the jurors summoned for either civil or criminal business may by order of the court be used interchangeably for either civil or criminal business as occasion may require," and (R. L. c. 176, § 27, now G. L. c. 234, § 27) that "If, by reason of challenge or otherwise, a sufficient number of jurors duly drawn and summoned cannot be obtained for the trial of a case, the court shall cause jurors to be returned from the bystanders or from the county at large, to complete the panel, if there are on the jury not less than seven of the jurors who were originally drawn and summoned as before provided. . . ."

The proceedings here assailed were regular under these statutes. The sitting of the Superior Court each month for Suffolk County for criminal business is single and not several. It is conducted in sessions of varying number according to the pressure of business and other controlling causes. Each session is a part of the single sitting for the month. The clerk of the Superior Court issues writs of *venire facias* for jurors "before each sitting and at such other times" as the court may order (R. L. c. 176, § 10, now G. L. c. 234, § 10), and the court may issue venires whenever necessary (R. L. c. 176, § 12, now G. L. c. 234, § 12). The designation in the *venire facias* of the particular session of the single sitting held each month for the county of Suffolk at which the jurors shall attend is a matter of convenience and does not constitute that session a special sitting nor those jurors a special jury under R. L. c. 157, § 30 (see now G. L. c. 212, § 21). It is still a single sitting and the jurors may be impanelled interchange-

ably in any of its sessions. The docket of the court shows that no special sitting was held and that no special jury was summoned for the case at bar. The third session at which this trial was held is treated as matter of court record as a part of the single sitting of the court held for February, 1919. When the jurors who had been summoned for attendance upon the third session were discharged, that session was not compelled to suspend until a new *venire facias* could bring into court new jurors; it might lawfully continue its work and avail itself of other jurors in attendance upon that single sitting although generally serving in other sessions. The case at bar is not within the prohibition of R. L. c. 176, § 27, to the effect that not more than five of any jury can be made up of bystanders and the county at large, because all the jurors were taken from those duly summoned under the relevant and permissive provisions of St. 1912, c. 209, amending R. L. c. 157, § 29, quoted above. Said § 27 is designed to secure for every party trial before a jury of which seven at least have been selected in accordance with the careful scrutiny required by the law for the preparation of lists of inhabitants of good moral character, of sound judgment, of adequate physical and mental strength, not exempt from jury duty, and free from all legal exceptions and otherwise fit for jury service, R. L. c. 176, § 4, now G. L. c. 234, § 4, and drawn to serve as required by the law. All of the jury impanelled in the case at bar had these qualifications. The circumstance that only five were summoned to serve at a criminal sitting is not material in view of the terms of the governing statutes.

13. The evidence, as to enhancing the price of fish by sham bidding and selling on the exchange, while slender, cannot be pronounced inadequate to warrant the submission of this point to the jury. There was testimony tending to indicate that some of the defendants, when they and the business concerns for whom they acted had quantities of fish ample for their needs, bid upon fares of fish merely for the purpose of keeping up the price. There was evidence as to several specific instances as well as of general practices of this nature. The reasons urged against the weight of this were for the jury. This evidence related to matters occurring after the alleged conspiracy was formed, but it bore upon the intent of those who joined in it.

14. There was evidence to support the portion of the indictment relating to violation of the cold storage laws. This related to obliteration of marks on packages showing dates of putting fish in refrigeration, to taking fish from one cold storage place and putting it in another, to the acquisition of cold storage plants, to observations by police officers and conversations by them with some of the defendants which were susceptible of being treated as admissions, and to other facts which need not be narrated. Although doubtless the primary purpose of the cold storage law, St. 1912, c. 652, G. L. c. 94, §§ 69–73, was protection of the public health, yet if violation of it was one of the means included in the confederation for the accomplishment of its end, the evidence was pertinent.

15. The allegations as to fraudulent issue of stock as a means to accomplish the conspiracy were confined by the trial judge in submitting the case to the jury to two particulars: (1) whether there was a fraudulent issue of stock in the Maine corporation to the defendant Dyer when he was not entitled thereto, (2) whether some or all of the defendants voted to take from the treasury of the Maine corporation money obtained from the exorbitant prices of fish and pay it as dividends to holders of stock who had no title to it. The facts might have been found to be these: A transfer was made by the Bay State Fishing Company of Massachusetts of its assets to Dyer in return for $500,000 in cash, first preferred stock in the Maine corporation of the same name of the par value of $500,000 and common stock therein of the same par value. Dyer, having taken a bill of sale of its property from the Massachusetts corporation, immediately transferred the same property to the Maine corporation and received in return therefor $500,000 in cash, five thousand shares of its first preferred stock of a par value of $500,000 and twenty-nine thousand nine hundred and eighty-nine shares of its common stock (being all its common stock except eleven shares held by the directors) of a par value of $2,998,900. Out of these securities he paid his obligation to the Massachusetts corporation. He used about seventy-nine hundred shares of common stock by way of bonus with sales of other preferred stock in the Maine corporation and retained for his own purposes about seventeen thousand shares. Some of this was distributed among his alleged confederates and a large part of it

was retained by him. There was evidence sufficient to support a finding that the transfer of this property was in substance and effect directly from the Massachusetts to the Maine corporation and that the form of the transfer through Dyer, the promoter of the Maine corporation, was not genuine but was a mere form or pretence to cover the fraudulent purpose of issuing to him substantially all the common stock of the Maine corporation without consideration and in violation of his fiduciary obligation to the Maine corporation as its promoter, he making no disclosure of the secret profit made by him from the transaction. The directors of the Maine corporation, in accordance with the forms of the Maine law, voted to pay $500,000 in cash and to issue all the stock subsequently received by Dyer, in payment for the purchase from him by the corporation of all the assets of the Massachusetts corporation, and to authorize the treasurer to issue such stock to Dyer or his nominees. The directors further passed a resolution adjudging that the property thus to be purchased from Dyer was in value equal to the value of the cash and stock of the Maine corporation to be issued in payment therefor. This was also in compliance with the form of the Maine law. The directors who passed these votes were so called "organization" or "dummy" directors, named by Dyer, acting in his interests and making no independent investigation as to the value of the property so purchased and paid for. There was no disclosure by Dyer of the profit to be made by him out of the transaction. It was the intention of Dyer and his associates that some of the first and second preferred stock should be sold to the public without disclosure of the secret profit. These were the facts in their aspect most favorable to the Commonwealth. Whatever may be said as to this conduct when assailed in a civil suit by the corporation in the interests of stockholders who became such by original subscription without notice of the secret profit by the promoters, *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. 159, these facts do not show any violation of R. L. c. 208, § 57, now G. L. c. 266, § 66. That statute so far as relevant to these facts is in these words: "An officer, agent, clerk or servant of a corporation, or any other person, who fraudulently issues . . . a certificate of the stock of a corporation to a person who is not entitled thereto . . . shall be punished . . ." This is a

penal statute. It is not to be extended beyond its fair implications. *Harvey* v. *Easton,* 189 Mass. 505. This statute plainly refers to the manual making out and handing over of the physical thing known as a certificate in fraud to one having no right to it. Its natural import is that it reaches to the individual who may have custody of blank certificates of stock perhaps signed by other officers who may have power to put in circulation such a certificate in fraud of the corporation or otherwise. The statute is directed to a ministerial officer rather than to directors who do not in any event according to present practices issue certificates but authorize the issuance of stock. The statute is not aimed at directors in voting to instruct the proper ministerial officers to issue stock to promoters, who by receiving the same in return for property sold by them to the corporation at a secret profit violate their fiduciary obligation to the corporation. It is designed to punish the ministerial officers who in fact fraudulently issue certificates. It cannot rightly be stretched to include the acts of a board of directors in voting instructions to a treasurer to issue stock in payment of property to be conveyed to the corporation at a valuation in stock fixed by vote of the directors. This is not issuing certificates of stock; it is voting to issue certificates of stock. The case was left to the jury on the theory that, if Dyer was found to be the promoter of the Maine corporation and sold his property to it at a profit in return for its stock without pursuing one of the methods by which a promoter may secure perfect title to stock received in payment of such sale (203 Mass. at page 178), then there might be a verdict of guilty as to those defendants who conspired to cause that transaction to come to pass, provided its purpose was to enhance unreasonably the price of fresh fish and thus to cheat the public. It is not for us to speculate whether the General Court might have penalized a vote by the directors such as that here disclosed, which was held in *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn,* 210 U. S. 206, to be free from even civil liability on the part of the promoter. We can only say that the words used are not fairly susceptible of that meaning.

It follows that there was error in this respect in refusing certain requests for instructions, in the charge as given and in the admission of considerable evidence, including the case of *Mason* v.

*Carrothers,* 105 Maine, 392. It is not necessary to narrate further details of requests, charge or evidence bearing upon this aspect of the common law counts.

16. As a necessary consequence the admission of evidence and the charge respecting payment of dividends on this stock were erroneous.

It follows that there was error in the trial of the common law counts.

17. The statutory counts rightly were left to the jury. The statute upon which they were founded, St. 1912, c. 651, § 2, prohibits a combination "for the purpose [1] of destroying the trade or business" of another engaged in selling goods or commodities, "and [2] of creating a monopoly within this Commonwealth." The union of these two purposes as the regnant design of those joining in the combination is all that § 2 of the statute requires as elements of the forbidden act. *Opinion of the Justices,* 211 Mass. 620. There is nothing in this section of the statute which requires in addition the presence of a malevolent purpose. That factor cannot be read into this section as matter of judicial construction. Malice is expressly made a constituent element in one aspect of the acts prohibited and declared unlawful by § 1 of the same statute. Its omission from the second section cannot be regarded as accidental or unintentional. It may be that the result of the statute is to prohibit such acts as were held lawful in *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* 23 Q. B. D. 598; *S. C.* [1892] A. C. 25. That, however, is a matter for the Legislature and not for us.

18. The statute, said c. 651, now G. L. c. 93, §§ 8–12, as thus construed is not unconstitutional. No right of the citizen secured by the fundamental law is violated by prohibiting him from engaging in a business enterprise for the combined purpose of destroying the business of another and of creating a monopoly. As has already been pointed out the common law looks upon monopoly in many aspects with disfavor. The prohibition of monopoly by statute has generally been recognized as a valid exercise of legislative power. As was said in *International Harvester Co. of America* v. *Missouri,* 234 U. S. 199, at page 209: "The purpose of such statutes is to secure competition and preclude combinations which tend to defeat it. . . . There is nothing in

the Constitution of the United States which precludes a State from adopting and enforcing such policy." The establishment of such public policy by the General Court is equally free from inhibition under the Constitution of this Commonwealth. The statute here assailed is supported by the principle of numerous decisions. *Commonwealth* v. *Strauss*, 191 Mass. 545. *Opinion of the Justices*, 193 Mass. 605, 610. *Merchants Legal Stamp Co.* v. *Murphy*, 220 Mass. 281. *Merchants Legal Stamp Co.* v. *Scott*, 220 Mass. 389. *Duane* v. *Merchants Legal Stamp Co.* 231 Mass. 113. *United Shoe Machinery Corp.* v. *United States*, 258 U. S. 451. In an advisory opinion in 211 Mass. 620, where authorities are collected, the view was expressed that this statute if enacted would be constitutional. The ground has been reviewed anew for the purposes of the present decision. Without repeating what was there said, we see no reason to doubt the validity of the statute.

19. There was evidence to support the conclusion that one purpose of the defendants was to destroy the business of the dealers on the pier who declined the invitation to come into the combination. The threats menacing the business of those dealers made by some of the defendants already referred to were adequate basis for that conclusion. These threats to various dealers were, "It is policy for you to get in, in out of the wet;" "We will take care of you;" "We," meaning the Bay State Fishing Company and their allies, will "put the O'Haras on the bum;" the "second preferred stock was going fast and that 'those who didn't get aboard quick would get left';" that they wanted the "live ones;" that "some of these concerns aren't in very good financial circumstances, and it is only a question of time when they will have to get out." There was also some evidence of personal hostility.

20. The forceful argument in behalf of the defendants, to the effect that a finding was unwarranted that the defendants combined for the purpose of creating a monopoly requires reference to the evidence.

It might have been found that Boston at the time in question was the largest market in the country for fresh fish. The business for many years had centred about T Wharf and its immediate vicinity, where also was the fish exchange. From early days fish has been an important article of food and the catching and mar-

keting of fish a great industry in this Commonwealth. General scarcity of food and definite government propaganda for more extensive use of fish seemed to assure stability to the fish industry. The close proximity of Boston to the Georges fishing bank was strong indication of its continued primacy as centre of fresh fish on the Atlantic coast. Competition from the fishing industry in other places was insignificant. The Commonwealth had built and opened for use in 1914 the so called fish pier with every convenience for vessels of all types engaged in bringing fresh fish to port. To this pier the dealers and the great part of the business in Boston forthwith removed. To it went substantially all the fresh fish arriving in Boston, a very small amount going elsewhere. Upon the pier were constructed buildings and railroad tracks adapted for the reception, sale, care, refrigeration and transportation in inter- and intrastate commerce of fresh fish on a large scale. Here was the fish exchange, by means of which were established, chiefly through auctions by captains of fishing craft as they came in from the sea, prices of fresh fish which prevail in places mainly supplied from Boston. The fish exchange was a corporation. Its stockholders were exclusively fish dealers on the pier, of whom there were less than fifty, each dealer holding one share. This corporation, by charges for its facilities, had been exceedingly prosperous and had accumulated a surplus of several million dollars. A large refrigeration plant was upon the pier and its stock was mainly owned by the fish dealers doing business at the pier. The nature of the fish business requires a speedy sale after reaching the pier by captains of all kinds of fishing vessels of their catches of fish. The pier with all its facilities was practically under the control of the less than fifty dealers in fish who there carried on business. About 1908 several men prominent in business in Boston had introduced fishing by steam vessels especially constructed for the purpose, called trawlers, this being the method used with great success in the North Sea. The Bay State Fishing Company, a Massachusetts corporation, was organized to carry on this business. The fares of the trawlers were brought to be sold on the fish exchange, as were those of other fishing vessels. But the trawlers were able to fish in weather which made impracticable fishing in other craft and they brought in much larger catches and were not so much affected by adverse winds in going to and

returning from the fishing banks as were other fishing vessels. Therefore the trawler possessed great advantage in quantity of fish produced and in the certainty and speed of trips. It was far more efficient in catching fish in large quantity than other vessels. In 1916 this Massachusetts corporation owned a fleet of nine trawlers and had three more under construction. Scarcity of vessels due to the great war gave a signal advantage in the production of fish for the Boston market to the owner of this fleet of trawlers with captains and crews already experienced in the work. This was the only fleet of trawlers operating from Boston, although a few others brought fish there. Thus unified control of the fleet of trawlers, of the fish exchange, the refrigeration plant and the places of business on the pier might well have been thought likely to give to a single owner a dominant position in the fresh fish business of Boston and the territory tributary to it and governed by prices there prevailing. Early in 1916 the defendant Dyer, having previously made some investigations concerning fish business in Boston, at a meeting of the fish dealers of the pier in substance said that he was a promoter interested in selling stock rather than fish, that some large combinations had been successfully arranged by him, that he thought it would be a good idea to get the fish people together, that Mr. Rich (one of the defendants) had told him that "he thought he could get at least sixty to sixty-five per cent [into the proposition] at the start." He outlined a plan by the formation of a corporation with first preferred, second preferred and common stock for acquiring control of the fresh fish business and that there were "millions in it" for all the fish dealers to join in a single corporation; that there was no limit to what could be done in the fish business if the production, distribution and use of by-products could be in unified control; that branches could be established all over the country and in that way a business could be established that no one could take away; that if all the dealers went into the proposed corporation they would get a million dollars of common stock. He said that he intended to control the fish business. When charged by one of the dealers present with trying "to steal the fish business," Dyer replied, "I don't know whether we are going to steal it or not, but we are going to get control of it." At the same meeting another defendant dwelt upon the economies

that could be effected by joining in the proposed combination. Another expressed the view that it would be a good thing to get the business all under one head and that the defendant Dyer was the man who could do it. Many of the fish dealers on the pier were individually invited to become stockholders in the proposed corporation and substantially all of them were asked either before or within a short time after its organization. To several who hesitated or refused, business threats or words reasonably susceptible of that construction were used by one or more of the defendants. During the year 1916 approximately one hundred and fifty-four million pounds of fish were landed at the fish pier, of which approximately one hundred and thirty-one million five hundred thousand pounds were handled by the dealers comprehended within the scheme outlined by Dyer.

One of the early moves of Dyer was to go to a firm of shipbuilders where trawlers were being built for the Bay State Fishing Company and place an order in his own name for the building of two trawlers for the purpose of preventing others from getting such vessels built. He later testified in another proceeding, "That was where I thought I did a very clever thing because I didn't think they [the owners of the Bay State Fishing Company of Massachusetts] would leave a loop-hole open to build the same type of boats for an outsider, and let competition come in against them." He then made a contract for the purchase of the fleet of trawlers and the business of the Bay State Fishing Company for $500,000 in cash and stock in a new company to be formed by him aggregating in par value $1,000,000. He then caused the Bay State Fishing Company of Maine to be formed with an authorized capital of $3,000,000 in seven per cent first preferred, $2,000,000 in six per cent second preferred, and $3,000,000 in common stock, voting power being vested in common stock alone, the par value of each share of the several classes being $100. The first preferred stock was to be sold, thirteen thousand four hundred and ninety-seven shares being later issued, the second preferred to be issued for the acquisition of the business of dealers on the pier, of which nine thousand eight hundred and sixty-four shares were issued, and the common stock with the exception of a few shares required for directors was in fact all issued to Dyer, nominally in part payment for the assets of the Bay State Fishing

Company of Massachusetts and by him distributed in part among his associates, he retaining, however, a large amount of it and receiving by way of dividends on it from May 31, 1917, to December 1, 1918, more than $61,000. Dividends were paid on all classes of stock, but by reason of opposition to declaring dividends on the common stock a large minority of the directors resigned. There was evidence which warranted the jury in finding to be facts all the foregoing statements.

Plainly in the nature of things no one can acquire a monopoly of the fish in the sea. But the situation was peculiar at the time and place of the events here in issue. If the evidence already summarized had been found to be true, the jury might have found further that the conception of a monopoly in the fresh fish business in Boston by the combination of the fleet of trawlers, the fish exchange and the other facilities for handling fish at the pier, and the stores of the dealers in fish on the pier was rational and feasible and might have been accomplished if the dealers had co-operated with substantial unanimity in executing the plan of Dyer. The exigencies of the great war might have been found to be such as to be likely to impede for some years at least the possibility of any substantial competition with the Bay State Fishing Company of Maine as it would have become entrenched by the successful completion of the scheme of its promoter. The catching of fish in the sea as a natural right is open to all alike. The fleet of trawlers and the practical domination of the fish trade in the hands of the dealers on the fish pier, together with the stress of all shipbuilding growing out of the great war, might have been found such as practically to prevent the establishment of real competition. The evidence warranted a finding of facts materially different from those disclosed in *Commonwealth* v. *North Shore Ice Delivery Co.* 220 Mass. 55. It was said by the present Chief Justice of the United States in *United States* v. *Addyston Pipe & Steel Co.* 29 C. C. A. 141, 153, "It may be . . . that local monopolies cannot endure long, because their very existence tempts outside capital into competition; but the public policy embodied in the common law requires the discouragement of monopolies, however temporary their existence may be. The public interest may suffer severely while new competition is slowly developing."

In the case at bar the jury were instructed that there was nothing illegal in the defendants' planning by lawful means to do the largest business in producing, distributing, buying, selling and dealing in fish, and thereby to make a gain or profit; and that if it was found that the purpose was that the Bay State Fishing Company of Maine should become a large producer and a large distributor of fish, and that by increasing the efficiency of the business, and by economies and savings effected fish could be furnished at reasonable prices with profit, or that the acts, declarations and admissions of the defendants were reasonably susceptible of that construction, then the defendants were not guilty. This was sufficiently favorable to the defendants. See *United States* v. *United Shoe Machinery Co.* 247 U. S. 32; *United States* v. *United States Steel Corp.* 251 U. S. 417. There was evidence sufficient to support a finding of the existence of a purpose to establish a monopoly critically harmful to the public welfare.

21. A large number of exceptions was taken respecting evidence, twelve hundred sixty-four according to the brief for the Commonwealth. A great many of these relate to questions preliminary and discretionary in their nature. Manifestly it would protract this opinion beyond reasonable length without advantage to anybody to state and discuss all these exceptions. Many of them were taken without specification of ground of objection. In the consideration of these questions the general principles must be borne in mind applicable to a trial for a combination amounting to conspiracy to accomplish the acts denounced in the statute upon which all the counts except the first two are founded. Whether the proceeding be civil or criminal, such an association or combination may be found to exist from purely circumstantial evidence and may be re-enforced by declarations, admissions or conduct of one in furtherance of the common object. It follows that many facts of no consequence in isolation may be proved because of the persuasiveness of their united effect. *Attorney General* v. *Tufts*, 239 Mass. 458, 493, 494. *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229, 249.

(a) It is not necessary to consider in detail exceptions to evidence respecting the counts at common law. As already stated the verdicts must be set aside as to those two counts and at a new trial on those counts the questions concerning evidence are

not likely to arise in the same way. For the reasons heretofore given, evidence to the effect that no information was given to the directors of the Maine corporation or to the fish dealers and others who became stockholders therein of the secret profits made by Dyer in promoting that corporation and as to the means employed by him in selling stock, evidence as to the law of Maine touching promoters' profits, and other evidence of that nature bearing upon the alleged issue of stock in violation of G. L. c. 266, § 66, and payments of dividends thereon, ought to have been excluded.

(b) Evidence as to the methods of bidding for fish on the exchange by dealers who were stockholders of the Maine corporation, and withdrawal of its fish for a time from the exchange and the consequences as affecting the prices of fish and the resultant advantages to the Maine corporation, bore more or less directly upon the general designs of the defendants as to their control of the price of fish, and as to their intentions toward the other fish dealers.

(c) Evidence as to the organization and corporate powers of the Maine corporation, its capital stock and the amounts and methods of its issue was competent as bearing upon its utility and availability as an instrument of monopoly. Testimony as to the acquisition of subsidiary companies was pertinent for the additional reason that it showed actual manipulation of the Maine corporation by the defendants to that end. Much evidence as to records, although remote, cannot be said to have prejudiced the substantial rights of the defendants.

(d) Evidence as to the acquisition of control of the cold storage plant at Portland and the use made of its facilities was relevant upon the issue whether the defendants intended to establish a monopoly and the means used toward the accomplishment of that purpose.

(e) Testimony as to the interest of the Maine corporation as lessee of a part of T Wharf and the interest of one of the defendants in another fish store there located, and other evidence of that nature, bore upon the general dominance of the defendants in the fish business and was competent.

(f) There is no privilege between attorney and client where the conferences concern the proposed commission of a crime by the

client. *Alexander* v. *United States,* 138 U. S. 353. *Regina* v. *Cox,* 14 Q. B. D. 153. *Doherty* v. *O'Callaghan,* 157 Mass. 90, 93. Amounts paid as compensation to the attorney who was a witness and alleged to be a co-conspirator were admissible in the discretion of the court. Objections to the testimony of Mr. French on this ground were not well founded. He was alleged to be one of those who participated in the illegal combination, although he was not indicted.

(g) Evidence as to hale of vessels written on the blackboard of the exchange ordinarily would not have been admissible as detached facts. But in connection with the method of business there prevailing and the means available to fish buyers as to the state of the market and the prices based upon the information there displayed, its admission cannot be pronounced erroneous. See *Donovan* v. *Boston & Maine Railroad,* 158 Mass. 450.

(h) The testimony of the defendant Dyer respecting the matters here under inquiry in another proceeding were admissible against him as admissions. There was no error in the reception of evidence concerning his relations with Hallett, alleged to be a conspirator.

(i) The introduction in evidence of publications of the Bay State Fisherman issued under the authority of the Maine corporation shows no reversible error. That corporation was under the control of the defendants and the order for these publications might have been found to have been a part of a comprehensive scheme outlined by one or more of the defendants. Its business methods and assertions in its name tending to show monopoly were admissible as indicating the execution of a purpose to establish monopoly. The factors employed in establishment and maintenance of a monopoly are so numerous and shifting as to have slight significance each standing alone and yet to possess convincing force in combination. *Swift & Co.* v. *United States,* 196 U. S. 375.

(j) The witness Beardsley, who had been long in the fish business in Boston and for several years had been statistician for the federal government, rightly was permitted to give computations made by him from books of the fish exchange which were in court tending to indicate monopoly. Other objections to his testimony are overruled. *Commonwealth* v. *Sturtivant,* 117 Mass. 122.

(k) It is not necessary further to state in detail the exceptions to evidence. *Commonwealth* v. *Warner*, 173 Mass. 541, 548. They do not involve such questions of law as require notice one by one. No reversible error appears to have been committed in the particulars thus raised. The rulings were either discretionary, or withdrawn and corrected so far as erroneous or related to immaterial matters, or for other reasons do not require a sustaining of exceptions. *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 386.

22. Much evidence was admitted subject to the defendant's exception on the promise of the assistant district attorney that it would be connected with the defendants or some of them. This ruling fairly interpreted means that it was admitted on that condition and that if the defendants deemed at the close of the evidence that no such connecting evidence had been introduced, it was the duty of the defendants to move to have the evidence stricken out. *Commonwealth* v. *Johnson*, 199 Mass. 55, 59. *Clarke* v. *Fall River*, 219 Mass. 580, 586. See *Attorney General* v. *Pelletier*, 240 Mass. 264, 312–314. Without going over these exceptions in detail, it is enough to say that the evidence was either competent, admissible in the discretion of the court, harmless in its adverse effect upon the defendants, or should have been made the subject of motion by the defendants to strike it out and to direct the jury to disregard it.

23. The argument of the defendants that the trial judge abdicated his function and made the prosecuting officer the judge of the admissibility of evidence is utterly without foundation in facts, and is wholly unwarranted. The phrases in which some of his rulings on the admissibility of evidence were couched were calculated to call the attention of the prosecuting officer to the risk taken in pressing the evidence after objection. But there is no ground for the contention that the judge was not at all times "the directing and controlling mind at the trial," and discharging his important duties with impartiality and sound discretion and in accordance with correct practice. *Whitney* v. *Wellesley & Boston Street Railway*, 197 Mass. 495, 502. *Plummer* v. *Boston Elevated Railway*, 198 Mass. 499, 515. *Maxwell* v. *Massachusetts Title Ins. Co.* 206 Mass. 197, 200. *Posell* v. *Herscovitz*, 237 Mass. 513, 515.

24. The defendants requested the court to give instructions to

disregard many suggestions contained in the closing argument of the Attorney General. It is the duty of the court to guard solicitously the rights of parties against improper arguments by counsel to the jury. The presiding judge followed this rule by giving appropriate instructions. *London* v. *Bay State Street Railway,* 231 Mass. 480. *Buckley* v. *Boston Elevated Railway,* 215 Mass. 50, 56. *Commonwealth* v. *Richmond,* 207 Mass. 240, 250. *Tildsley* v. *Boston Elevated Railway,* 224 Mass. 117. *Commonwealth* v. *Cabot,* 241 Mass. 131, 146, 147. *O'Driscoll* v. *Lynn & Boston Railroad,* 180 Mass. 187. It is not every argument, seemingly futile to the court, to which the attention of the jury must be called. *Commonwealth* v. *Brownell,* 145 Mass. 319. *Commonwealth* v. *Maddocks,* 207 Mass. 152. *O'Brien* v. *Boston Elevated Railway,* 214 Mass. 277. It is not necessary to examine one by one the infractions of propriety by the Attorney General urged by the defendants. It is enough to say that there is no reversible error in this regard as far as concerns the statutory counts.

25. It is open to grave doubt if any exception was saved with respect to the rendition and affirmation of the verdict. Objection is not exception. *Ogden* v. *Aspinwall,* 220 Mass. 100, 103. But there was no irregularity affecting the validity of the verdict. *Commonwealth* v. *Tobin,* 125 Mass. 203. *Charles* v. *Boston Elevated Railway,* 230 Mass. 536.

26. Counsel for the defendants stated in their brief and orally that they relied upon all exceptions not argued, of which there is a considerable number. It is the general rule that exceptions not argued are treated as waived. Discussion by the court of exceptions cannot be required by assertion by parties that they are not waived when not regarded as of sufficient merit to admit of argument by counsel. The court exercises its power to correct genuine errors of law. *Pond* v. *Williams,* 1 Gray, 630, 634. *Brightman* v. *Eddy,* 97 Mass. 478. *Noyes* v. *Noyes,* 224 Mass. 125, and cases collected at page 134. Ordinarily it spends no time in the elucidation of matters not deemed by those in interest as worthy of their own reasoning faculties. *Fay* v. *Hunt,* 190 Mass. 378, 381. *Doyle* v. *Peerless Motor Car Co. of New England,* 226 Mass. 561, 569. *Ryder* v. *Ellis,* 241 Mass. 50, 60. All the exceptions have been examined. Those deserving attention have been dealt with in this opinion.

27. The case was submitted to the jury in a charge which was comprehensive, clear and fair. It protected the rights of the defendants save in the particulars already noticed. It is not open to criticism in the aspects which concern the statutory counts. The exceptions to it, so far as they require discussion, are disposed of by what already has been said.

28. A separate verdict of guilty was rendered on each count of the indictment. The errors in the admission of evidence and in the charge to the jury pointed out in paragraphs numbered 15, 16 and 21 of this opinion relate solely to the first and second counts. The evidence improperly admitted as bearing upon the fraudulent issue of certificates of stock in the Maine corporation and payment of dividends thereon and other matters of a kindred character in connection with the common law counts doubtless consumed considerable time at the trial. Very likely it afforded some ground for criticism in the minds of the jury as to the corporation methods employed by the defendants. But evidence as to the establishment of the Maine corporation, the amount and classes of its capital stock, the nature of the property transferred to it and all other factors connected with it as an instrument calculated to produce and maintain a monopoly was admissible to prove the allegations of the statutory counts. This included the acquisition of the control of the property of the earlier Massachusetts corporation and of other corporations and of dealers in fish. The charge to the jury as to the statutory counts, while depending upon the portion of the charge as to common law counts for the definition of monopoly, was in other respects distinct and separate. That definition of monopoly was correct. The charge and the trial as to the statutory counts were not affected adversely to the defendants as matter of law by errors as to the common law counts. The result is that the verdicts rendered upon the first and second counts must be set aside. There is no reversible error as to the remaining counts. The verdicts as to the remaining counts stand and judgment may be entered thereon provided a *nolle prosequi* is entered as to the first and second counts. *Commonwealth* v. *Nickerson,* 5 Allen, 518, 529. See *Holt* v. *Sargent,* 15 Gray, 97, 103, and *Simmons* v. *Fish,* 210 Mass. 563. The case is to be treated with respect to the two groups of counts, so far as concerns verdicts and judgments, the

same as if the trial had been had upon separate indictments for each charge. *Commonwealth* v. *Fitchburg Railroad,* 120 Mass. 372, 380. The defendants each were sentenced by a single sentence on all the counts and the execution of the several sentences was stayed. It follows that the sentences are set aside.

*So ordered.*